HOWARD E. HALL *v.* OWEN COUNTY STATE BANK; ALLAN L. REED

[No. 1-177A4. Filed December 20, 1977. Rehearing denied January 20, 1978.]

*Robert A. Ledgerwood, Nisenbaum & Brown*, of Indianapolis, for appellant.

*Hickam & Hickam*, of Spencer, for appellee.

ROBERTSON, C.J.—Defendant-appellant, Howard Hall (Hall) brings this appeal from an adverse judgment by the trial court, sitting without a jury, in an action by Owen County State Bank (Bank) for judgment on three promissory notes executed by Hall. The fifteen issues raised by Hall on appeal may be grouped and summarized as follows:

1. Is the decision of the trial court that Hall waived his right to notice under IC 1971, 26-1-9-504(3) not supported by sufficient evidence and contrary to law? (Hall's issues 9 & 10).

2. Is the decision of the trial court that Hall received sufficient notice of the sale of collateral under IC 1971, 26-1-9-504(3) not supported by sufficient evidence and contrary to law? (Hall's issues 1, 3, 4, 5 and 7).

3. Is the decision of the trial court that the fair value of the collateral did not exceed $25,000.00 not supported by sufficient evidence? (Hall's issue 6).

4. Is the trial court's decision that the sale of the collateral was commercially reasonable not supported by sufficient evidence and contrary to law? (Hall's issues 11 and 12).

5. Did the trial court err by not awarding certain attorney's fees to Hall? (Hall's issue 15).

6. Did the trial court err in not allowing Hall to testify as to certain elements of his claim for punitive damages? (Hall's issue 2).

7. Is the decision of the trial court that the Bank did not act in a willful and malicious manner not supported by sufficient evidence and contrary to law? (Hall's issue 8).

8. Is the decision of the trial court on the complaint and on Hall's counterclaim not supported by sufficient evidence and contrary to law? (Hall's issues 13 and 14).

The relevant facts of this case show that sometime in late 1971, Hall and his son-in-law, Allan Reed, began a trucking business under the name of H & R Trucking Company. In order to finance the needed trucking equipment, it was necessary for Hall and Reed to apply for loans from the Bank. The Bank granted loans aggregating approximately $56,000.00 in return for promissory notes and a security interest in the equipment purchased with the loan proceeds.

All went well until late 1973 or early 1974 when the business began to fail and Hall and Reed became delinquent in their monthly installments on the notes. At one point in the spring of 1974, one Bank officer, Lewis Cline, testified he called on Hall at his home to discuss the delinquent loan payments and that Hall stated he could not afford to make any more payments, that he "washed his hands" of the entire matter and did not want to be bothered any more, and that the Bank should thereafter talk with Reed.

The Bank then contacted Reed on numerous occasions concerning the delinquent loans and an attempt was made to restructure the payment schedule. However, Reed was unable to make the payments required under the new schedule and the Bank, on June 8, 1974, sent a letter to Reed demanding possession of the collateral, which consisted of two tractor-trailer rigs. On Sunday, June 30, 1974, Reed delivered both tractors and both trailers to the Bank's parking lot without any prior notice to the Bank. He returned the next morning, Monday, July 1, to surrender to the bank the keys to the trucks.

Robert Ingalls, a used car and truck dealer in the area, was in the Bank on Monday morning and noticed the trucks in the parking lot. He inquired as to whether the equipment was for sale, and upon receiving an affirmative response, began to negotiate with Bank officers for the purchase of the equipment. Later that day, the negotiations ended with a take-it or leave-it offer for that day only of $25,000 in cash for all four units.

After deciding to accept the offer, the Bank notified Reed, who was at Hall's residence in Gosport, by telephone and Reed returned to the Bank. Bank officers explained the terms of the sale to him and explained that the proceeds of the sale were less than the amount due on the notes. Reed agreed that Ingalls' offer was fair and endorsed the truck titles without objection. Ingalls then paid the $25,000.00 to the Bank and the Bank credited the entire amount, without any deductions for expenses, to the amount due on the notes.

On June 9, 1975, the Bank filed its action against Hall and Reed for the amount still due under the notes. Default judgment was rendered against Reed and he has not joined in this appeal. Hall filed his answer, certain affirmative defenses, and a counterclaim against the Bank for compensatory and punitive damages. The trial court found in favor of the Bank and against Hall and awarded judgment against Hall in the sum of $2,328.25 in principal and interest and $500.00 in attorneys' fees. Hall then timely perfected this appeal.

The trial court stated in its finding that Hall had waived his right to notice of sale and that he was therefore estopped to assert any lack of notice. This finding is based on the meeting between Hall and Lewis Cline in which Hall allegedly stated that he "washed his hands" of the whole matter and directed the Bank to deal exclusively with Reed. Hall argues that this finding is contrary to law and not supported by sufficient evidence. He argues that he was entitled to notice of sale under IC 1971, 26-1-9-504(3).[1] He further cites IC 1971, 26-1-9-501(3) as being a statutory provision of a waiver of that notice and also cites a provision incorporated in each of the notes which states:

---

1. IC 1971, 26-1-9-504(3) reads in pertinent part as follows:

(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor. . . .

"If any notification of intended disposition of any of the collateral is required by law, such notification shall be deemed reasonably and properly given if mailed at least ten (10) days before such disposition, postage pre-paid, addressed to the Borrower at the address shown on other side."

The Bank argues, on the other hand, that IC 1971, 26-1-9-501(3) does not apply in this situation, that notice of sale can be waived, and that Hall did in fact waive his right to any notice.

IC 1971, 26-1-9-501(3) (which is §9-501(3) of the Uniform Commercial Code) reads in pertinent part as follows:

(3) To the extent that they give rights to the debtor and impose duties on the secured party, the rules stated in the subsections referred to below may not be waived or varied . . .

(b) subsection (3) of section [26-1-]9-504 and subsection (1) of section [26-1-]9-505 which deal with disposition of collateral;

While this section has not been the subject of interpretation by the Indiana appellate courts, it appears that a question has arisen in the cases from other jurisdictions dealing with UCC § 9-501(3) as to the extent of this non-waiver provision. The cases seem to be in agreement, and we would also agree, that under this section the secured party may not incorporate a waiver provision in the security agreement. However, there is a split of authority as to whether or not the debtor may waive notice of sale after default. In *Nelson v. Monarch Investment Plan of Henderson, Inc.* (1970), ____ Ky. ____, 452 S.W.2d 375, it was held that UCC § 9-501 applied only to the antecedent agreement between the debtor and secured party (the security agreement) and did not affect the right to invoke the principals of waiver and estoppel to transactions of the parties subsequent to default. In *O'Neil v. Mack Trucks, Inc.* (Tex. Civ. App. 1975), 533 S.W.2d 832, 19 UCC Rep. 984, the court held that only a written waiver signed after default would be effective against the debtor. Finally, the court in *Aimonetto v. Keepes* (Wyo. 1972), 501 P.2d 1017, 11 UCC Rep. 1081, ruled that UCC § 9-501(3) prevented any waiver of the debtor's right to notice under UCC § 9-504(3).

Although it has been argued that UCC § 1-103[2] brings in the

2. 26-1-1-103. Supplementary general principles of law applicable.—Unless

common law of waiver and estoppel so as to allow a waiver by the debtor after default, we feel that the general provisions of UCC § 1-103 are supplanted by the specific language in section 9-501(3) prohibiting any waiver. Furthermore, Indiana has not adopted the 1972 amendments to the UCC proposed by the Commissioners on Uniform State Laws which would amend UCC § 9-504(3) to allow the debtor to sign after default a renunciation of his rights to notification. Finally, we find very persuasive as to the policy behind UCC § 9-501(3) the following portion of Official Comment 4 to UCC § 9-501:

> The default situation offers great scope for overreaching; the suspicious attitude of the courts has been grounded in common sense.
>
> Subsection (3) of this section contains a codification of this long standing and deeply rooted attitude: the specified rights of the debtor and duties of the secured party may not be waived or varied except as stated.

Although there are persuasive arguments in favor of allowing a waiver of rights by the debtor after default, we feel the better interpretation of UCC § 9-501(3), and that which is more in line with the policy of UCC § 9-504 to protect the rights of the debtor, is that the non-waiver provision of UCC § 9-501(3) applies both before and after default. We therefore hold that IC 1971, 26-1-9-501(3) does not allow a waiver by the debtor of his right to reasonable notification under IC 1971, 26-1-9-504(3) and that the trial court erred in finding that Hall waived notice of the sale and was estopped by this waiver to contest the sale because of insufficient notice.[3]

Hall further argues that the trial court erred in its findings of fact that sufficient notice was sent by the Bank to Hall. Although the trial court's findings do not specifically state that sufficient notification was sent by the bank, its Finding Number 14 implies

---

displaced by the particular provisions of this act [26-1-1-101 — 26-1-10-106], the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

3. Because the trial court's finding that Hall was estopped to deny the validity

that the trial court felt the notice sent to Reed was sufficient to bind Hall due to their relationship as partners.

There seems to be no doubt that the sale of collateral in this case should be classified under the UCC as a private sale rather than a public sale. The only notice requirement for a private sale under IC 1971, 26-1-9-504(3) is that the secured party give "reasonable notification" to the debtor "of the time after which" the sale or disposition will be made. There is no formal step by step procedure which the secured party must follow, and there are no rigid time limits which must be obeyed. This type of procedure for sale of collateral after repossession is a rejection of the formal notice and sale requirements of the Uniform Conditional Sales Act[4] which was the law in this state (and in many other states) prior to the enactment of the UCC in 1963. According to Official Comment 1 to UCC § 9-504, the intent of the drafters of the UCC in this section was to encourage private sales through normal commercial channels. The drafters recognized the traditionally dismal results of the sheriff's public auction at the courthouse door and hoped that informal private sales through the regular course of business would "result in higher realization on collateral for the benefit of all parties."

The term "reasonable notification" is not specifically defined in the UCC. In § 1-201(26), the following definition of "notifies" is given:

A person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it."

Under this definition, the test is not whether or not the debtor receives the notice, but only whether the secured party made a good faith effort and took such steps as a reasonable person

of the notice was based upon Hall's purported waiver, we need not decide whether the doctrine of estoppel might be applicable under different facts or circumstances.

4. See Uniform Conditional Sales Act, §§ 15-22, Ind.Ann.Stat. § 58-815 through 58-822 (Burns 1951 Replacement).

would have taken to give notice. Accordingly, most courts have held that there is no absolute requirement under § 9-504 that the debtor actually received notice.

The word "send", which is found in § 1-201(38), is defined in such a manner as to imply that the notice must be in writing. While some courts have indeed held that only a written notice will suffice under § 9-504,[5] there is also authority to the contrary.[6] We feel that a rigid rule of law mandating a written notice in all cases conflicts with the general tenor of the UCC to reject strict procedural requirements and we would therefore read § 1-201(38) in conjunction with § 1-201(26) so as to impose upon the secured party the duty of taking reasonable steps to notify the debtor. The fact that the notice was oral instead of written should not invalidate that notice as a matter of law but should instead be one of the factors considered in deciding whether or not the notice was reasonable.

Although no definition of "reasonable notification" is contained in the UCC itself, Official Comment 5 to § 9-504 contains this definition:

> "Reasonable notification" is not defined in this Article; at a minimum it must be sent in such time that persons entitled to receive it will have sufficient time to take appropriate steps to protect their interests by taking part in the sale or other disposition if they so desire."

At least one state has grafted onto this definition, as a matter of law, a minimum number of days' notice needed to make the notice reasonable. *DeLay First National Bank & Trust Company v. Jacobson Appliance Co.* (1976), 196 Neb. 398, 243 N.W.2d 745, 19 UCC Rep. 994 (three days). Again, however, we must reject that line of thinking as being contrary to the basic purposes of the UCC. Although we feel that any case involving a very brief notice to the debtor should be closely scrutinized by the trial court, we

---

5. *De Lay First National Bank & Trust Co. v. Jacobson Appliance Co.* (1976), 196 Neb. 398, 243 N.W.2d 745, 19 UCC Rep. 994; *Foundation Discounts, Inc. v. Serna* (N.M. 1970), 468 P.2d 875, 7 UCC 854.

6. *Fairchild v. Williams Feed, Inc.* (Mon. 1976), 544 P.2d 1216, 18 UCC Rep. 822; *Crest Investment Trust, Inc. v. Alatzas* (1972), 264 Md. 571, 287 A.2d 261.

also feel that the length of time of the notice should be included as one component in the decision as to whether reasonable notification was given by the secured party.

On the facts of this case, we feel the conclusion is inescapable that the Bank was required to send reasonable notification of the sale to Hall and that the Bank failed to do so.

Although H & R Trucking Company was named on the note and security agreement as debtor, the complaint filed by the Bank named Hall and Reed individually as defendants and did not name the partnership. Furthermore, Hall apparently signed the note in his individual capacity thereby making himself personally liable. IC 1971, 26-1-3-403(2)(b). Therefore, he would fall within a definition of debtor under IC 1971, 26-1-9-105(1)(d) and would be entitled to reasonable notification under IC 1971, 26-1-9-504(3).

It is uncontested that no written notice of the sale was ever sent to Hall. The record shows that the bank official who telephoned Hall's house on the date of sale did not remember speaking to Hall or even if Hall was present at that time. More importantly, the notice was given only hours before the sale and Hall testified that he did not receive any notice until after the sale was completed. We feel that the notification sent by the Bank was insufficient to allow Hall to protect his interest in the collateral. We therefore hold that the Bank failed to send the reasonable notification required under IC 1971, 26-1-9-504(3).

The other errors raised by Hall concerning the admission of certain partnership evidence bear only on the sufficiency of the Bank's notice to Hall. As we have decided in favor of Hall on this issue, we need not discuss these other issues.

Having decided that the Bank failed to send reasonable notification to Hall under IC 1971, 26-1-9-504(3), the question arises as to the effect of such a failure. It appears that there are no Indiana cases dealing with this question.

The cases decided in other states are hopelessly divided on the question as to whether the secured party should be barred from

recovering a deficiency judgment from the debtor when there has been insufficient notice of the disposition of collateral after repossession.[7] In addition to these courts, it seems that the commentators are also in disagreement on this question.[8] From the language of UCC § 9-504, it appears that the drafters of the UCC either did not consider this question or else decided to leave the question open. At least one notable authority has stated that the drafters indeed failed to consider this issue.[9]

It has been argued that because § 9-504(2) and § 9-502(2) specifically give the secured party a right to collect any deficiency and because there is no language in § 9-504 to indicate that a creditor should be barred from a deficiency, the courts should have no authority to supply such a sanction. In contrast, the language of § 2-706, which allows the seller of goods to resell those goods after breach by the buyer and collect damages from

7. For decisions allowing a deficiency, see *Grant County Tractor Co., Inc. v. Nuss* (1972), 6 Wash. App. 866, 496 P.2d 966; 10 UCC Rep. 1104; *Norton v. National Bank of Commerce of Pine Bluff* (1966), 240 Ark. 143, 398 S.W.2d 538, 3 UCC Rep. 119; *Alliance Discount Corp. v. Shaw* (1961), 195 Pa. Super. 601, 171 A.2d 548, 1 UCC Rep. 644; *T & W Ice Cream, Inc. v. Carriage Barn, Inc.* (1969), 107 N.J. Super. 328, 258 A.2d 162, 6 UCC Rep. 1230; *Weaver v. O'Meara Motor Co.* (Alas. 1969), 452 P.2d 87, 6 UCC Rep. 415; *Mallicoat v. Volunteer Finance & Loan Corp.* (1966), 57 Tenn. App. 106, 415 S.W.2d 347, 3 UCC 1035, 4 UCC Rep. 49; *Leasing Associates, Inc. v. Slaughter & Son, Inc.* (8th Cir. 1971), 450 F.2d 174, 9 UCC Rep. 1292; *Universal C.I.T. Credit Co. v. Rone* (1970), 248 Ark. 665, 453 S.W.2d 37, 7 UCC Rep. 847; *Community Management Association of Colorado Springs, Inc. v. Tousley* (1973), 32 Col. App. 33, 505 P.2d 1314, 11 UCC Rep. 1101.

For decisions barring a deficiency judgment see *Braswell v. American National Bank* (1968), 117 Ga. App. 699, 161 S.E.2d 420, 5 UCC Rep. 420; *Foundation Discounts, Inc. v. Serna* (1970), 81 N.M. 474, 468 P.2d 875, 7 UCC Rep. 854; *Washington v. First National Bank of Miami* (Fla. App. 1976), 332 So.2d 644, 19 UCC Rep. 989; *C.I.T. Corporation v. Haynes* (1965), 161 Me. 353, 212 A.2d 436, 2 UCC Rep.1000; *Atlas Thrift Co. v. Horan* (1972), 104 Cal. Rptr. 315, 11 UCC Rep. 417; *Aimonetto v. Keepes* (Wyo. 1972), 501 P.2d 1017, 11 UCC Rep. 1081.

At least two states have reported conflicting decisions from the same court: *Leasco Computer, Inc. v. Sheridan Industries, Inc.* (1975), 82 Misc.2d 897, 371 N.Y.S.2d 531 (allowing deficiency), and *Leasco Data Processing Equipment Corp. v. Atlas Shirt Co., Inc.* (1971), 66 Misc.2d 1089, 323 NYS.2d 13 (barring a deficiency); *Abbott Motors, Inc. v. Ralston* (1964), 28 Mass. App. Dec. 35, 5 UCC Rep. 788 (allowing a deficiency) and *One Twenty Credit Union v. Darcy* (Mass. App. Div. 1968), 5 UCC Rep. 792.

8. See Hogan, *Pitfalls in Default Procedure*, 86 Banking L.J. 965, 978 (1969); 2 G. Gilmore, Security Interests in Personal Property § 44.9.4 (1965).

9. 2 G. Gilmore, supra. note 6, at p. 1264.

the buyer (much like a repossession sale and suit for deficiency judgment) strongly implies that notice to the buyer in that case is a condition precedent to the recovery of damages.

It can also be argued that the adoption of a rule which strictly bars a deficiency judgment in cases of faulty notice contravenes the intent and purpose of the UCC. First of all, as stated above, the drafters of the UCC intended to do away with rigid rules of law designed to govern in all situations in favor of more fluid guidelines which allow a case by case analysis. It was hoped that this procedure would allow parties to reach the merits of each case instead of becoming entangled in procedural technicalities:

> "Article 9 imposes few formal requirements and relies instead on the general obligation of commercial reasonableness. It was hoped that Article 9 default litigation would reach, and be decided on, the merits of the case without being deflected either by the debtor's allegations of a technical defense or the secured parties' demonstration of equally technical compliance with formalities. 2 Gilmore, Security Interests and Personal Property, § 44.9.4 at p. 1264. (1965)."

Furthermore, the policy of the UCC as expressed in § 1-106 is to allow full recompense to an aggrieved party by a liberal application of the remedies provided in the UCC and to avoid the assessment of penal damages, unless such damages are expressly allowed by the UCC or other law.[10] It would seem that an automatic denial of a judgment for the remaining portion of a debt would amount to a rejection of that policy. The Nebraska Supreme Court, in rejecting a strict rule barring· deficiency judgments because of insufficient notice, also felt that such a rule would be unduly punitive: "No sound policy requires us to inject a

---

10. By this, we do not mean to imply that punitive damages should never be allowed in this type of situation. We are merely stating that punitive damages have no place in the normal commercial transaction, including most repossessions, just as such punitive damages have no place in the normal breach of contract suit. However, as stated in IC 1971, 26-1-1-106, where the debtor can plead and prove the facts necessary to support some other theory, an award of punitive damages might be appropriate. Such circumstances might include a situation where the debtor can clearly show that the secured party is intentionally and maliciously violating the rights of the debtor. See *Hibschman Pontiac, Inc. v. Batchelor* (1977), 266 Ind. 310, 362 N.E.2d 845; *Vernon Fire & Casualty Ins. Co. v. Sharp* (1976), 264 Ind. 599, 349 N.E.2d 173; *Jones v. Abriani* (1976), 169 Ind. App. 556, 350 N.E.2d 635.

drastic punitive element into a commercial context." *Cornett v. White Motor Corp.* (1973), 190 Neb. 496, 501, 209 N.W.2d 341, 344, 13 UCC 152.

Probably the most persuasive argument for allowing a secured party to proceed with an action for a deficiency judgment is the fact that the UCC has already provided the debtor with a remedy in § 9-507. Under the latter section, if a secured party is not proceeding properly, the debtor may either restrain the creditor from proceeding further, or may recover from him any loss that the debtor may have suffered due to the secured party's failure to comply with the provisions of Article 9. Further protection is afforded under § 9-507 to the debtor in a consumer transaction in that a minimum damage figure is set out, which roughly equals the interest charge plus 10% of the cash price of the goods. In addition, under the provision of § 5-103 of the Uniform Consumer Credit Code, IC 1971, 24-4.5-5-103, the debtor is not liable for any deficiency where the secured party elects to repossess goods which had a price of $1100.00 or less and which were a part of a consumer credit sale.

Some rather persuasive arguments have also been advanced in favor of barring deficiency judgments in all cases where the secured party does not proceed properly. Such a rule would seem to be easier to apply, might bring about more uniform results and could possibly force creditors to be more careful in giving notice to debtors. Furthermore, there is nothing in the language of the UCC to suggest that the remedy provided in § 9-507 was intended to be an exclusive remedy. Section 1-103 brings traditional common law into play, such as equitable principles and principles of justice and fair play, which should suggest that a creditor should not be allowed a deficiency judgment when he breaks the law:

"The rule and requirements are simple. If the secured creditor wishes a deficiency judgment he must obey the law. If he does not obey the law, he may not have his deficiency judgment. *Atlas Thrift Company v. Horn* (1972), 104 Calif. Rptr. 315, 11 UCC Rep. 417, 426."

It must also be considered that by failing to take proper steps to notify the debtor, the secured creditor can effectively deprive the debtor of his right to redeem the collateral under § 9-506 and his right to protect his interest by procuring bids or buyers at any private or public sale that is held.

After considering both the cases and policy arguments on this issue, we feel that the better rule of law would allow the secured creditor a right to an action for a deficiency judgment notwithstanding a failure to send proper notice under IC 1971, 26-1-9-504(3). In addition to the reasons cited above, we feel that the UCC should function on the premise that the majority of commercial transactions are carried out in good faith. In those cases in which the secured creditor has not complied with the appropriate notice provisions, or has otherwise not proceeded in good faith, it is better to adopt a more flexible standard which will allow the secured party to recover the damages caused by the debtor's breach, but which will also allow protection to the debtor on a case-by-case basis. The debtor is provided a remedy in IC 1971, 26-1-9-507 and we see no reason to attach a further penalty to the creditor by declaring an automatic forfeiture of his right to a deficiency judgment.

A majority of the cases allowing the creditor to proceed in an action for a deficiency under these circumstances have ruled that the creditor before recovering his judgment, must rebut the presumption that the collateral was at least equal in value to the amount of the debt. We think that this is a sound policy, for in cases where the debtor was not notified of an impending sale, the creditor should be in a much better position to prove the value of the collateral at the time of the disposition. See *Universal C.I.T. Credit Co. v. Rone* (1970), 248 Ark. 665, 453 S.W.2d 37, 7 UCC Rep. 847. Furthermore, it seems fundamentally unfair to put the burden of showing the value of collateral after it has been repossessed and sold upon a debtor who has received insufficient notice of the disposition. We hold, therefore, that when a secured creditor disposes of collateral without proper notice under IC 1971, 26-1-9-504(3), he must then prove, in his action for a deficiency judgment, that the reasonable value of the collateral at

the time of the sale was less than the amount of the debt.

In meeting the burden outlined above, the creditor may not merely rely on the value which he received from the repossession sale. We agree with the Arkansas Supreme Court that "it is only where the sale is conducted according to the requirements of the code that the amount received or bid at a sale of collateral is evidence of its true value in an action to recover a deficiency." *Universal C.I.T. Credit Corp. v. Rone*, (1970), 248 Ark. 665, 669, 453 S.W.2d 37, 39-40.

Furthermore, the secured party may not rely solely on testimony of his credit manager or his other employees as to their opinions of the fair value of the collateral. Instead, the creditor must introduce other additional credible objective evidence of value. See *Weaver v. O'Meara Motor Co.* (Alas. 1969), 452 P.2d 87, 6 UCC Rep. 415.

Hall also contends that the trial court's finding that the sale of collateral was conducted in a commercially reasonable manner is not supported by sufficient evidence and is contrary to law, and that its finding that the value of the collateral at the time of sale did not exceed $25,000 is also not supported by sufficient evidence. We shall consider these issues together.

The UCC does not give a specific definition of a commercially reasonable sale of collateral. IC 1971, 26-1-9-504(3) states that the disposition, whether by sale or otherwise, "may be as a unit or in parcels and at any time and place and on any terms, but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." Some examples of a commercially reasonable sale are given in IC 1971, 26-1-9-507(2). If the collateral is sold in the usual manner in a recognized market for those goods, or if the goods are sold for the price that is current in that market, then the sale is presumed to be proper. Also, if the sale is conducted in conformity with "the reasonable commercial practices among dealers in the type of property sold", or if the disposition is approved in a judicial proceeding, it will be presumed to be commercially reasonable.

However, it is also specifically provided that this is not an exclusive list of commercially reasonable dispositions.

Because the statutory definition of a commercially reasonable sale is vague, and because a judgment as to whether or not a sale was reasonable will generally depend upon the circumstances of each particular case, many courts have held this to be a question of fact. *Jones v. Morgan* (1975), 58 Mich. App. 455, 228 N.W.2d 419, 16 UCC Rep. 1450. We also feel that whether a sale was held in a commercially reasonable manner is a question of fact. We further agree with the decisions holding that the secured creditor has the burden of showing, as a part of his burden of proof in an action for a deficiency judgment, that the sale or disposition was performed in a commercially reasonable manner. *Beneficial Finance Company of Black Hawk County v. Reed* (Iowa 1973), 212 N.W.2d 454, 13 UCC Rptr. 1974; *Tauber v. Johnson* (1972), 8 Ill. App. 3d 789, 291 N.E.2d 180, 11 UCC Rptr. 1106.

Certainly one of the most important factors to be weighed in deciding whether or not a disposition or sale was commercially reasonable will be the price received by the secured party. In cases where a fair sale price was received, the debtor will have suffered no injury and normally will have no complaint (except, perhaps, in cases where the debtor would have been able to find alternate financing and redeem the collateral). In cases where a fair sale price was not received, the other items to be considered will generally be relevant to the extent that they may have prevented a fair price or contributed to an unfair price.

It is expressly provided in IC 1971, 26-1-9-507, however, that the sale price is not the only item to be considered:

> (2) The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner . . .

The above provision gives recognition to the fact that only on rare occasions will a repossession sale bring the highest bids or

the highest value for the collateral and therefore such sales could always be vulnerable to attack by a showing that a higher price *might* have been obtained under different circumstances. This means that a secured creditor may not be held liable to the debtor or be deprived of a deficiency judgment when the secured party has, in good faith, conducted a commercially acceptable sale or disposition, even where a low sale price is received:

> If the secured creditor makes certain that conditions of the sale, in terms of the aggregate effect of the manner, method, time, place and terms employed conform to commercially accepted standards, he should be shielded from the sanctions contained in Article 9 [of the UCC]. *In re Zsa Zsa Limited* (S.D.N.Y. 1972), 352 F. Supp. 665, 671, 11 UCC Rep. 1116.

However, even though a low sale price itself is insufficient to overturn a sale, closer scrutiny will generally be given sales in which there is a *substantial* difference between the sale price and the fair value to determine whether there were legitimate causes for the low price such as a depressed or non-existent market, or whether the low price was caused by the secured party's failure to proceed in a commercially reasonable manner.

One relevant factor to be considered in determining whether the sale price was reasonable may be the price received by the buyer of the collateral in a subsequent sale. A showing that the collateral was sold only a short time later, after little or no reconditioning or cleaning, at a substantially or disproportionately higher price, may strongly imply that the secured party failed to receive a fair price for the collateral. See *Mercantile Financial Corp. v. Miller* (E.D. Pa. 1968), 292 F. Supp. 797, 7 UCC Rep. 402.

Another factor which may be relevant is whether the collateral is sold on a retail or wholesale market. It is certainly true that a retail sale of goods will in most cases command a much higher price. However, a retail sale will usually generate considerably more expenses, such as reconditioning expenses, advertising expenses and sales commissions, insurance costs, etc., and usually will take much longer to consummate. This in turn may result in higher storage expenses and a higher interest accrual under the original obligation. Therefore, a sale to a dealer on the wholesale

market will probably be the more reasonable approach in most cases. Sales to a dealer also seem to be suggested by UCC § 9-504 and the Official Comments to that section (which suggest that a private sale will be preferable in many cases) and also by Official Comment 2, to UCC § 9-507:

> One recognized method of disposing of repossessed collateral is for the secured party to sell the collateral to or through a dealer — a method which in the long run may realize better average returns since the secured party does not usually maintain his own facilities for making such sales."

While we feel that in most cases a sale or disposal of collateral to a dealer or on a wholesale market or auction will be commercially reasonable, the answer to this question will generally depend upon the circumstances of each particular case and will therefore be a question of fact for the factfinder in most cases.

Other factors to be considered in deciding whether a sale was commercially reasonable include the number of bids received or solicited, particular in a private sale. While we would not hold sales invalid as a matter of law where only 1 or 2 bids were received, such sales must receive the closest scrutiny and should be declared invalid where there is evidence of collusion, self-dealing, or bad faith. In addition, the time and place of the sale must be such that they are reasonably calculated to bring a satisfactory turnout of bidders, particularly in the case of a public sale. In deciding whether or not the disposition of collateral was accomplished in a commercially reasonable manner all of the relevant factors should be considered together. This means that the sale or disposition should be considered to be one transaction, as stated by the court in *In Re Zsa Zsa Limited, supra*:

> "It is the aggregate of circumstances in each case — rather than specific details of the sale taken in isolation — that should be emphasized in a review of the sale. The facets of manner, methods, time, place and terms cited by the Code are to be viewed as necessary and interrelated parts of the whole transaction. 352 F. Supp. at 670."

In attacking the trial court's findings as not being supported by sufficient evidence and as being contrary to law, Hall carries a

heavy burden on appeal. The decision of the trial court will be sustained on appeal, when being attacked as not being supported by sufficient evidence, when there is substantial evidence of probative value to support its findings. Furthermore, we will neither weigh the evidence, nor judge the credibility of witnesses and we cannot substitute our judgment for that of the trial court. *Rieth-Riley Construction Co. Inc., v. McCarrell* (1975), 163 Ind. App. 613, 325 N.E.2d 844. Finally, it is only where the evidence is without conflict and can lead to but one conclusion and the trial court has reached an opposite conclusion, that the decision of the trial court will be set aside on the grounds that it is contrary to law. *Blankenship v. Huesman* (1977), 173 Ind. App. 98, 362 N.E.2d 850.

Hall advances four arguments in support of his contention that the sale was not conducted in a commercially reasonable manner. First, the value of the collateral exceeded the sale price of $25,000.00. Next, the Bank as seller was unfamiliar with the equipment it was selling and with the value of the equipment. Third, the Bank failed to publish notice of the sale and failed to contact any purchasers other than the ultimate purchaser. Finally, there was no appraisal of the collateral before the sale.

We feel that the evidence produced by the Bank, although minimal, was sufficient to carry its burden of proof as to the value of the collateral so as to rebut the presumption that the collateral was at least equal in value to the outstanding debt and was sufficient to sustain the trial court's finding that the value of the collateral did not exceed $25,000.00.

One of the witnesses called by the Bank was Robert Ingalls, who was the original purchaser of the collateral and who was an experienced used car and truck dealer in Spencer. Ingalls testified that he had trouble selling the equipment and that Reed, Hall's partner, had been trying to sell the equipment for some weeks prior to the bank's repossession, but had been unsuccessful. He further testified that the trucks were not roadworthy when he bought them, that they would not have passed state

inspection, and that $25,000.00 was the full value of the equipment.[11]

The Bank also called as a witness James Roemer who was General Manager of Indiana Truck Center, a large truck dealership in Indianapolis. Roemer testified that his dealership had purchased three pieces of the collateral (two tractors and one trailer) from another dealer that had purchased the equipment from Ingalls. Although Roemer had purchased these three pieces for $23,000.00, he testified that after spending over $5,400.00 to recondition the equipment, he sold them, at retail, for only $30,500.00.

The trial judge received testimony, from experienced truck dealers, that the equipment was not in good shape, that $25,000

---

11. The following is a portion of Ingall's testimony on direct examination:

Q. Now then, when you purchased these vehicles, Mr. Ingalls, from the bank lot there, did you look at them before you made an offer?

A. Yes, I did.

Q. Did you attempt to ascertain their physical and mechanical condition?

A. Yes, I did.

Q. How did they appear to you? What did you decide?

A. Well, my first thought when I looked at these vehicles, was they were worth $20,000 to me. This is strictly my own opinion, but I make my living doing this. After thinking about it for awhile, and so forth, I went back and raised my figure, but these vehicles, when I purchased them from the bank lot, were not capable of passing safety inspection to run on the state highways of the state of Indiana. I trade better trucks off in my business, in my trucking business, I trade better trucks off than I bought here, by far. I would call these trucks pretty common trucks, that needed a lot of money spent on them to make them roadworthy.

Q. In your opinion were they roadworthy at the time?

A. No way.

Q. Mr. Ingalls, do you feel that the $25,000 in cash that you paid for these four units was the full, fair market value of them at that time?

A. I most certainly do. I'd have been tickled to death the next day to have took $500 loss and send them down the road.

Q. You mean to give them back to the bank, and give them $500 in addition, and say, "let me out of the deal"?

A. I'd have been tickled to death.

Q. You would?

A. Yes Sir.

was a fair price under the circumstances, and that the equipment was eventually sold at retail, after substantial reconditioning and after passing through three dealers, for a sum not substantially greater than the original sale price. While there was other credible evidence which tended to show a higher value of the collateral, we cannot say that the finding of the trial court was supported by insufficient evidence and we must therefore affirm that finding.

Hall further contends that the sale of the collateral was not reasonable because no appraisal of the equipment was made and because the bank officials conducting the sale were unfamiliar with the equipment. However, Hall has failed to explain how an appraisal of the equipment could have been of any possible benefit in this case. We would agree that an appraisal might be a prerequisite to a commercially reasonable sale of some types of goods, but we do not feel that used trucks would necessarily fall into that category.

In his argument that the sale was unreasonable because the Bank employees were not familiar with the equipment Hall relies on the case of *Liberty National Bank & Trust Co. of Oklahoma City v. Acme Tool Division of the Rucker Company* (10th Cir. 1976), 540 F.2d 1375, 19 UCC Rptr. 1288. The *Rucker* case, however, concerned the sale of an oil rig by the bank's attorney, who was totally unfamiliar with oil rigs and with auctions of such rigs and who had taken no steps to prepare the rig for auction. In addition, the purchasers at the auction, who paid $42,000.00 for the rig, sold the rig shortly thereafter for over $77,000 even though there had been no change in the market. Finally, the Circuit Court in that case was affirming the trial court's finding of fact that the sale was not commercially reasonable. We feel that the *Rucker* case is distinguishable on its facts in that the Bank employees conducting the sale in this case were experienced in selling repossessed cars and trucks, and one employee, Evans, testified he had previously worked for a used car and truck dealer for six years. Furthermore, the trial court in this case, unlike the trial court in *Rucker*, made a finding of fact that the sale was commercially reasonable.

Hall also argues that the sale was improper because the Bank failed to publish notice of the sale and because there was only one bid made. However, the sale in this case was a private sale to a dealer, not a public sale, and we see no reason to require public advertisement or publication in the case of a private sale.

The case of *Atlas Construction Co. v. Dravo Doyle Corp.* (Pa. C.P. 1965), 3 UCC Rptr. 124, 114 Pitt. L.J. 34 is cited by Hall in support of his argument that the sale should be voided because the Bank failed to solicit more than one bid. Although the court in that case ruled that a repossession sale of a crane was not commercially reasonable because of the low sale price and because only one bid was made, this was a case in which the jury made the findng of fact that the sale was not commercially reasonable. Furthermore, the creditor in *Dravo Doyle* was a dealer in cranes and yet did not attempt to solicit any further bidding from any of its customers. The debtor in that case had also produced a witness who testified that he would willingly have paid between five and eight thousand dollars more for the crane had he been given the opportunity to bid.

We agree with Hall that any private sale of collateral in which only one bid is received or solicited is highly questionable and should be closely scrutinized by the trial court. However, under the rather distinctive facts of this case, we cannot hold that the trial court erred in finding the sale to be commercially reasonable and we cannot say that the sale was improper as a matter of law.

The Bank had no prior notice as to when the equipment would be returned or in what condition it might be, but instead found the equipment in its parking lot on a Monday morning. The Bank therefore had no opportunity to solicit any bids before the day of the sale. The equipment was in need of repairs, as it had been used for some time in a failing business. That same morning, a reputable used car and truck dealer approached the Bank's loan officers and made a bid for the trucks. After several hours of negotiations with those officers, he made a take-it or leave-it offer of $25,000.00, good only for that day. This offer was particularly attractive in that the Bank was able to apply the entire sale price

against the outstanding debt, without deduction for any expenses, such as insurance, transportation and storage charges, clean-up and repair charges, advertising expense and sales expenses or commissions (Roemer of Indiana Truck Center testified that his salesmen received a 25% commission on their sales). Although the equipment was later resold by other dealers at a profit, none of the subsequent dealer-purchasers sold the equipment for a disproportionate profit. Furthermore, there was evidence that Reed had been unable to find a buyer for the equipment for several weeks prior to the repossession. He made no objection when the Bank informed him of Ingalls' bid and willingly returned to the Bank to endorse the titles.

Finally, we find most persuasive the fact that there is evidence of nothing but good faith conduct on the part of the Bank. There is no evidence in the record of any collusion or under-handed dealing by the Bank. Reed in his deposition stated that he had no criticism of the manner in which the Bank conducted the sale and Hall also stated that he did not feel that the Bank had cheated him in any way and that his only criticism was that the Bank had not given him sufficient time to sell the trucks himself.

Hall next argues that the trial court should have awarded him attorney's fees under IC 1971, 24-4.5-5-202(8) due to an improper charge for credit life and health insurance under the Bank's notes. However, the statute cited by Hall, which is § 5-202(8) of the Uniform Consumer Credit Code as adopted in Indiana, is limited to consumer credit sales, IC 1971, 24-4.5-2-102 and consumer loans, IC 1971, 24-4.5-3-102. A loan for the purchase of semi-tractor trailers for use in a trucking business does not fit under the definitions of consumer transactions in IC 1971, 24-4.5-2-104(1) and IC 1971, 24-4.5-3-104(1). Hall's request for attorney's fees was properly denied.

As to his claim for punitive damages, Hall contends that the trial court's finding that the Bank did not act in a willful and malicious manner is not supported by sufficient evidence and is contrary to law. Hall further argues that the trial court also erred by refusing to allow testimony concerning damages to his credit

rating caused by the Bank's actions as an element in his claim for punitive damages.

Damage to Hall's credit rating would more properly be an element of compensatory damages rather than punitive damages. In any event, as was stated above, there was no evidence introduced at trial to even remotely suggest any malicious or bad faith conduct on the part of the Bank. While it might be argued that some of the Bank's employees may have displayed some errors in judgment in their conduct of the sale, such conduct falls far short of the standard to be used in awarding punitive damages. See *Hibschman Pontiac, Inc. v. Batchelor, supra.* We can find no error in the trial court's rulings.

Finally, Hall contends that the decision of the trial court on the Bank's complaint and on Hall's counterclaim is contrary to the evidence, not supported by sufficient evidence and contrary to law. However, Hall offers no new arguments but merely makes reference to his arguments under his other issues. As those issues have been previously discussed, this issue merits no additional consideration.

Judgment affirmed.

Lowdermilk and Lybrook, JJ., concur.

NOTE—Reported at 370 N.E.2d 918.