**BLOOMINGTON NATIONAL BANK, Appellant,**

v.

**GOODMAN DISTRIBUTING, INC., David L. Goodman and Joan M. Goodman, Appellee.**

**No. 1–285A41.**

Court of Appeals of Indiana, First District.

Sept. 9, 1985.

Rehearing Denied Oct. 18, 1985.

Richard S. Harrison, Cotner, Mann & Chapman, Bloomington, for appellant.

John N. Shank, II, Indianapolis, Daniel J. Goodman, David W. McNabb, Knoxville, Tenn., for appellee.

ROBERTSON, Judge.

The plaintiff-appellant Bloomington National Bank (Bank) is appealing from a negative judgment denying a deficiency judgment from the sale of collateral securing a promissory note. The trial court also denied the counterclaim of the defendant-appellee Goodman Distributing, Inc., David L. Goodman and Joan M. Goodman (collectively referred to as Goodman).

The two issues raised by the Bank are whether the trial court erred in finding that the Bank's sale of the collateral was not commercially reasonable and that there was error in admitting two of Goodman's exhibits. Goodman raises two cross-errors.

We affirm.

A statement of facts favorable to the judgment shows that Goodman had been a customer of the Bank since 1976. Goodmans signed a promissory note for $18,-681.22 on November 8, 1979. The security for the note was gold and silver of the type used in manufacturing jewelry. The collateral deposit receipt provided for storage of the collateral in a safety deposit box which could only be opened in the presence of both parties and that any sale of the collateral must be preceded by a notice of execution to David L. Goodman certified mail at least fifteen days prior to the sale. Goodman demanded the notice provision to allow curing of any default. The note was a consolidation of three prior notes. Three payments on the note were made with the last payment being made on May 24, 1980. The Bank sent formal notice to Goodman for these payments when and as they became due.

The crucial part of the turn of events is reflected in the trial judge's well written opinion:

The loan was not paid in full on the due date, August 15, 1980. However, [Bank] sent no notice of this default to [Goodman], took no action to exercise any remedy available to it upon such default, and did nothing with the collateral.

[Goodman] who concedes knowledge of such default, proceeded on the apparent theory that no news was good news, and likewise did nothing. The defaulted loan and collateral were both forgotten until federal bank examiners visited [Bank's] establishment in October of 1981. Taking note of [Bank's] oversight, the examiners encouraged [Bank] to dispose of the collateral and close out the loan. [Bank], being occupied with other affairs, did not stir to action until March 11, 1982, whereupon it consulted the yellow pages of the telephone directory, selected a dealer in scrap gold and silver, and sold the collateral without any prior audit of the collateral by reference to the

nature or value of the collateral, without any exploration, without any competing bids, and without notice to the [Goodmans]. [Bank] though apparently receiving Seven Thousand Six Hundred Eight-Six Dollars ($7,686.00) from the sale, credited Seven Thousand Seven Hundred Dollars ($7,700.00) towards satisfaction of [Goodman's] obligation and filed suit against [Goodman].

The trial court continued relating to the Bank's lack of perspicacity:

[Bank] concedes that it failed to collect its loan or dispose of the collateral prior to March 11, 1982, for no other reason than its own negligence. [Bank] further concedes that it had no knowledge, experience or expertise in dealing in the type of collateral pledged as security for the loan by [Goodman], and that it took no steps to inform itself concerning the nature or value of the collateral or alternative methods for its disposition, save for reference to the yellow pages of the telephone directory.

Evidence which had a direct bearing upon the commercial reasonableness of the sale of the collateral was summarized by the trial judge:

The evidence in the case establishes that three reasonable alternative methods of disposition were available to an informed seller of jewelry grade metals. One alternative would have been the retail sale of the metals to end users of such refined and specifically formed materials, such as jewelers and other artisians, [sic] or to manufacturers. This method of disposition, coincidentally falling within the expertise and business experience of [Goodman], would have achieved the highest return from sale of the collateral. A second alternative would have been to wholesale the metals to a refiner or suppliers of such materials. This alternative, concerning which [Goodman] again might have lent aid, would have yielded a lesser return than that obtainable by exercise of the first alternative. The third alternative, which was in fact exercised by plaintiff, involved sale to a scrap dealer who generally resells materials to refiners to be melted down. The latter alternative, while the cheapest and most expedient alternative, would have yielded, and did yield, the lowest possible return from sale of the collateral.

During the period of time relevant to this case, gold and silver, which trade with substantial volatility under present economic circumstances, changed dramatically in value. The price of gold, for example sold for increasing value through 1979. The price of gold, which was just under Four Hundred Dollars ($400.00) per troy ounce in November of 1979, peaked in price at around Six Hundred Seventy-five Dollars ($675.00) per troy ounce in about September of 1980 and then descended steadily to a low price of around Three Hundred Fifteen Dollars ($315.00) per troy ounce in June of 1980. The evidence reveals that gold sold at Three Hundred Twenty-Eight Dollars and Ten Cents ($328.10) per troy ounce on March 11, 1982, the date of the sale of the collateral. While the prices referred to are for gold bullion, the price of gold in other forms and grades is governed by reference to the bullion market and tracks its path. Silver markets operate and trade in a similar fashion and did, during the relevant times herein, generally follow the path of gold. The evidence indicates that the collateral, if sold to a jeweler or other end user on March 11, 1982, would have sold for about Fourteen Thousand One Hundred Twenty-Eight Dollars and Seventy-One Cents ($14,128.71). If sold to a refiner on March 11, 1982, it would have returned Eleven Thousand Six Hundred Sixty-Five Dollars and Ninety-Five Cents ($11,665.95). Sold as scrap, it yielded Seven Thousand Six Hundred Eighty-Six Dollars ($7,686.00).

By comparison, evidence introduced during [Goodman's] case indicated that retail sale on August 15, 1980 could have yielded approximately Twenty-One Thousand Five Hundred Dollars ($21,500.00) and on September 15, 1980 could have yielded around Twenty-Four Thousand Dollars

($24,000.00). [Goodman's] evidence further indicated that wholesale disposition of the collateral on August 15, 1980 could have returned around Twenty Thousand Dollars ($20,000.00) and the same method of disposition on September 15, 1980 could have garnered around Twenty-Three Thousand Dollars ($23,-000.00). While the figures were not provided to the Court, it may be fairly assumed that even salvage sale to a scrap dealer in August or September of 1980 would have yielded dramatically more money than obtained by the sale on March 11, 1982, as gold in August and September of 1980 was then worth nearly twice as much as it was worth in March of 1982 and silver was then worth more than twice as much as it was worth in March of 1982.

The Bank's first issue is whether the trial court committed error as a matter of law when it required the Bank to prove the value of the collateral at a time other than the date of sale. The mainstay of the Bank's argument is the rather wordy opinion in *Hall v. Owen State Bank*, (1977) 175 Ind.App. 150, 370 N.E.2d 918. Bank argues that, according to *Hall* when there is no notice of the sale to the debtor that the burden on a secured creditor is to prove the sale was made in a commercially reasonable manner and that the value of the collateral at the time of the sale was less than the outstanding debt. *See: McEntire v. Indiana National Bank*, (1984) Ind. App., 471 N.E.2d 1216. It is the Bank's position that it overcame both burdens and the trial court erred in considering the value of the collateral at times prior to the sale.

We agree that there is no question that the value of the collateral at the time of the sale was less than the outstanding debt. However, the question of commercially reasonable bears scrutiny.

On appeal, we view the case from the following perspective:

> In cases tried by the court, we may not reverse the trial court's decision unless it is clearly erroneous and we give due regard to the trial court's opportunity to judge the credibility of witnesses. *Litzelswope v. Mitchell*, (1983) Ind.App., 451 N.E.2d 366. Ind.Rules of Trial Procedure, Trial Rule 52(A). When a judgment is attacked as being contrary to law, we neither consider credibility of witnesses nor weigh the evidence. Rather, we look solely to the evidence most favorable to the judgment, together with all reasonable inferences therefrom, and it is only when this evidence is without conflict and leads to but one conclusion and the trial court reached a contrary conclusion that we will reverse that decision as being contrary to law. *Dominguez v. Gallmeyer*, (1980) Ind.App., 402 N.E.2d 1295, *trans. denied.*

*Stubbs v. Hook*, (1984) Ind.App., 467 N.E.2d 29 at 31.

■ Whether or not a sale of collateral is commercially reasonable is a question of fact and depends upon the circumstances of each particular case. *Hall, supra.*

■ Two facts militate heavily against the Bank. First, the market price of the precious metals fell to about half of their value from the time they could have been sold and when they were sold. Second, the reason they were not sold until they were was, not because of business acumen, but because of negligence on the part of the secured creditor. Also significant, we believe, is the fact that not all of the collateral was sold with the whereabouts of the remainder not disclosed in the record. In sum, the various methods of selling collateral as discussed in *Hall* should not be used as a shield for a secured debtor who is negligent in failing to proceed in a commercially reasonable manner. *Hall, supra.* The trial court's decision on this issue is not clearly erroneous.

■ The next issue claims error in the admission of two exhibits by Goodman. One was an unsigned copy of the collateral deposit receipt and the other was a bid submitted by a precious metals dealer under the date of 12 June, 1979. It is argued that neither complies with the business

record exception to the hearsay rule, as set out in *American United Life Ins. Co. v. Peffley*, (1973) 158 Ind.App. 29, 301 N.E.2d 651. We would agree that the exhibits were admitted without the proper foundation being laid. However, the Bank does not inform us how they were harmed by their admission. In any event, the trial judge is presumed to know the intricacies of evidence and to consider evidence in that light by ignoring the extraneous, incompetent, and irrelevant. *Lambert v. State, By and Through Dept. of Highways*, (1984) Ind.App., 468 N.E.2d 1384. Reversible error has not been shown.

Goodman's two issues on cross-appeal deal with the failure of the trial court to award Goodman attorneys fees and failure to award damages on the counterclaim.

■■■ Goodman correctly cites *State ex rel. Reilly v. U.S. Fidelity and Guaranty Co. of Baltimore*, (1941) 218 Ind. 89, 31 N.E.2d 58 for the general proposition that attorneys fees, especially for the losing party, are not recoverable unless grounded in contract or statute. Goodman's argument based upon equitable considerations and the citation of a Texas case does not sway us away from the previously stated rule.

■■ Goodman's counterclaim sought return of the collateral (or like goods) or, in the alternative, the equivalent in damages, compensatory damages, punitive damages, and attorneys fees. We have already discussed the question of attorneys fees.

Goodman, in appealing from a negative judgment, stands in the same position as the Bank in appealing from the denial of the complaint for a deficiency judgment. The standard of review is as was stated in *Stubbs, supra.*

That part of the trial court's opinion ruling upon Goodman's counterclaim states:

Therefore, noting that [Goodmans] were aware of their default, that [Goodman] knew of the subjection of their collateral to the risk of liquidation and the fluctuations of the market, that [Goodmans] were familiar with the opportunities and risks in the commercial dealing in such materials, that [Goodmans] talked about, but did not pursue, alternatives available to them to protect their collateral, and further noting the rights and obligations of defendants David and Joan Goodman as guarantors, in addition to the above observations, the Court cannot find from the evidence that [Goodmans] suffered a loss as a result of [Bank's] conduct, let alone malice, oppressive conduct, or any other action by [Bank] which would give rise to punitive damages.

The Court finds that [Goodmans have thereby failed to prove their claim based on conversion of the collateral by the [Bank]. As [Goodmans] amended their counterclaim, orally, immediately prior to the presentation of evidence, the Court is unclear as to whether [Goodmans] continue to rely on their original claim of a fiduciary relationship between [Bank] and [Goodmans] giving rise to damages being adjusted against [Bank] for the benefit of [Goodmans]. In any event, no such claim was proved. The Court finds that [Goodmans'] evidence has proved no cause of action upon which relief can be granted.

We read this as saying that Goodmans' evidence failed to sustain their burden of proof.

Insufficiency of the evidence when appealing a negative judgment is not an issue for appellate review. *Houser v. Board of Com'rs. of DeKalb County*, (1969) 252 Ind. 312, 247 N.E.2d 675.

Goodman observes that IND.CODE 26-1-9-507 [1] allows a debtor entitled to notification of the sale of collateral to bring an

---

1. (1) If it is established that the secured party is not proceeding in accordance with the provisions of this Part disposition may be ordered or restrained on appropriate terms and conditions. *If the disposition occurred* the debtor or any person entitled to notification or whose security

interest has been made known to the secured party prior to the disposition has a right to receive from the secured party any loss caused by a failure to comply with the provisions of this Part....

action against the secured party for damages resulting from any loss caused by a failure to comply with the appropriate rules applicable to said sale. It is Goodman's contention that the trial court improperly interjected a theory akin to contributory negligence or estoppel to thwart the counterclaim.

Goodman's argument strays from the meaning and intent of the trial court's ruling. Goodman was accorded a cause of action as provided for in I.C. 26–1–9–507 but, according to the trier of fact, did not sustain the burden of proof. We have not been convinced that the trial court's ruling is clearly erroneous.

Judgment affirmed.

RATLIFF, P.J., and NEAL, J., concur.