848 F.2d 193
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
SIGMON-ELKHORN COAL CORPORATION, et al., Defendant-Appellant,
v.
WESTINGHOUSE CREDIT CORPORATION, Plaintiff-Appellee.
 No. 87-5347.
 United States Court of Appeals, Sixth Circuit.
 May 19, 1988.
 
 Before MILBURN and BOGGS, Circuit Judges, and ANN ALDRICH, District Judge.*
 PER CURIAM.
 
 
 1
 Defendant-appellant Sigmon-Elkhorn Coal Corporation, et al. (SECC) appeals the district court order denying its motion to alter and amend two deficiency judgments granted by the district court to the creditor, plaintiff-appellee Westinghouse Credit Corporation (WCC). This case began in June 1979 when WCC filed a Writ of Possession in district court for various items of collateral securing the indebtedness of SECC. Subsequent to disposition of all repossessed collateral, WCC amended its complaint seeking a deficiency judgment against SECC. SECC defended this action on the ground that the sales of 3 of the 30 items of collateral were "commercially unreasonable." UCC 9-504; KRS 355.9-504. After a bench trial, the district court entered deficiency judgments against SECC for $210,186.73 on the first promissory note affecting an airplane and a bulldozer, and for $170,723.21 on the second promissory note affecting a dragline. SECC then filed a motion to alter and amend the judgment. The district court denied the motion, and found that WCC sustained its burden of proving that the sales of the three items were commercially reasonable. The items at issue are the following: one Clark-Lima dragline with bucket and attachments; one Kingair A90 Beechcraft airplane; one Caterpillar D9 bulldozer. We affirm the district court findings that the above items were sold in a commercially reasonable manner.
 
 
 2
 * KRS 355.9-504, which adopts UCC 9-504, governs the creditor's obligations respecting the sale of repossessed collateral. That section states in relevant part:
 
 
 3
 [E]very aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. KRS 355.9-504(c)(3).
 
 
 4
 SECC maintains that the creditor has the burden to prove that the disposition of the repossessed collateral is commercially reasonable. School Supply Co. v. First National Bank, 685 S.W.2d 200, 203 (Ky.Ct.App.1984). Where the price realized is greatly disproportionate to the value of the property there is a presumption of commercial unreasonableness. Id. at 204.
 
 
 5
 "Whether or not a sale of collateral is commercially reasonable is a question of fact and depends upon the circumstances of each particular case." Bloomington National Bank v. Goodman Distributing, Inc., 482 N.E.2d 727, 730 (Ind.Ct.App.1985).
 
 
 6
 SECC maintains that the trial court's findings that the dragline, airplane and dozer were sold in a commercially reasonable manner were clearly erroneous and manifestly against the weight of the evidence. We review the district court's findings as to the sales of these three items of collateral under the "clearly erroneous" standard.
 
 A. CLARK-LIMA DRAGLINE
 
 7
 As its first argument on appeal, SECC argues that the dragline was "allowed to sit, unused and unsold, for an extended period of time." "When the [dragline] was finally put up for sale, its value had diminished drastically, as a result of deterioration and vandalism from June of 1979 to September 19, 1980." Specifically, SECC states that the dragline initially had a fair market value (FMV) of $1,000,000, and then deteriorated to $625,000 FMV. SECC maintains that the sale of the dragline yielded only $412,811.00, after deductions for repair, repossession costs, insurance coverage, moving expenses, and security expenses. Reducing SECC's argument on appeal to its essence, the court's findings respecting the dragline are, in SECC's view, clearly erroneous because the court failed to consider that the delay in sale led to both a loss in FMV and physical deterioration of the dragline.
 
 
 8
 There is no record evidence, however, that the dragline was ever worth $1,000,000. On the other hand, it is unrefuted that when SECC made its purchase in January 1978, the FMV of the dragline was $745,000.00. WCC further pointed out, contrary to SECC's assertions on appeal, that the FMV of the dragline at repossession was $575,000, which is confirmed by the district court. Indeed, the district court found that the dragline was sold for $625,000.00. Thus, any delay between repossession and sale did not cause a diminution in the FMV of the dragline. The record shows, moreover, that the sale of the dragline netted over $600,000 to SCC's account, which was well above the FMV of the dragline at repossession.
 
 
 9
 The period of time between repossession and sale was a little over one year; the dragline was repossessed in July 1979, and was sold on September 19, 1980. From WCC's point of view, this delay can be explained by coal industry depression at the time, the singular nature and large cost of the item, and certain repairs necessitated by vandalism. Record testimony indicates that the dragline is indeed a very large crane, with about a hundred or hundred and ten foot boom which can be dismantled into three to five pieces. The main housing, engine housing and operator's cab, with other machinery, are together two stories high. Record testimony suggests that WCC left the dragline on a job site in a remote part of Boyd County, Kentucky because of the great cost in moving it. There is also record testimony that WCC winterized the dragline, and had normal maintenance done. WCC also argues that the job site was considered to be a relatively safe place to keep the dragline because of its remoteness from habitation.
 
 
 10
 Between February and May of 1980, the dragline was vandalized. Record evidence indicates, however, that WCC took pains to see that the Clark Lima company performed the necessary delicate electrical repair work on the dragline. The record shows that WCC absorbed the cost of all necessary repairs. Record testimony indicates that WCC contracted with Paul Coffrey Construction Company to provide watchmen to guard the dragline against any further vandalism. No vandalism occurred to the dragline after the watchmen were hired. Despite the vandalism, WCC was able to sell the dragline for more than its appraised FMV of $575,000. We therefore disagree with SECC that that the vandalism caused any deterioration in the FMV of the dragline. Thus, Bank of Josephine v. Conn, 599 S.W.2d 773 (Ky.Ct.App.1980), holding that failure of a creditor to safeguard collateral from physical deterioration would constitute a violation of KRS 355.9-504, is not applicable because there is no evidence that the creditor failed to safeguard the collateral from physical deterioration. See also First National Bank v. Lachenmyer, 131 Ill.App.3d 914, 476 N.E.2d 755 (1985).
 
 
 11
 The court also found that WCC advertised the dragline in a color folder distributed to thousands of equipment dealers and end users in the coal and construction business. Record testimony indicates that interested buyers were flown into Lexington, Kentucky, and escorted to the worksite. WCC paid for a mechanic to start the machinery and demonstrate it in operation.
 
 
 12
 Given the size and cost of the dragline, the fact that the dragline was commercially advertised to equipment dealers and end users in the coal and construction business, the fact that any damage to the dragline caused by vandalism was repaired by WCC, the fact that the dragline nevertheless sold for more than its appraised FMV, we cannot conclude that the district court was clearly erroneous in its finding that the sale of the dragline was commercially reasonable.
 
 
 13
 Under Service Chevrolet, Inc. v. Sparks, 99 Wash.2d 199, 660 P.2d 760 (1983), SECC argues that the excessive period of time before sale of the dragline constitutes retention in full satisfaction of the debt by the creditor, irrespective of any notice from the creditor as to its intention in this regard. However, SECC's reliance on Service Chevrolet is misplaced. While the court held there that an excessive period of time before sale may constitute retention of collateral in satisfaction of debt by the creditor regardless of notice from the creditor, the question of what distinguishes a reasonable from an excessive period of time is for the trier of fact. 660 P.2d at 763. In the case at bar, the court found that given the size and cost of the dragline, the period of time before the sale of the dragline was not excessive, thereby foreclosing any retention argument. Finally, WCC argues persuasively that the cases cited by SECC involve either unreasonable or unexplained delays, and therefore are distinguishable. Florida First National Bank v. Martin, 449 So.2d 861 (Fla. DCA 1984) (delay of two years in sale of boat with staff negligence and bad deterioration of boat was unreasonable); Goodman Distributing, 482 N.E.2d at 730 (delay of 18 months on sale of jewelry grade metal with staff negligence and dramatic market decrease was unreasonable); Mack Financial Corp. v. Scott, 100 Idaho 889, 606 P.2d 993 (1980) (delay of nearly 2 years in sale of truck with no explanation for delay was unreasonable).
 
 B. KING AIR A90 AIRPLANE
 
 14
 As to the second item, the King Air A90 airplane, SECC argues that the main issue is "the fact that the creditor had allowed a third party to use the airplane for an extended period of time." However, SECC does not specify how much damage or deterioration was caused to the airplane by virtue of the third party's use of the airplane. SECC argues that "[t]he creditor's conduct in using (or allowing another to use) the very collateral at issue shows a commercially unreasonable approach to the duty properly to dispose of the collateral."
 
 
 15
 On June 18, 1979, the airplane was repossessed when it was in the possession of Stevens Beechcraft, a seller and servicer of airplanes, located in South Carolina. Before repossession, SECC had authorized Stevens Beechcraft to do certain repairs on the plane. The district court found that while the airplane was in the possession of Stevens Beechcraft it was flown numerous times. The district court stated that it was not clear "whether the flights were for demonstration to potential buyers or charter flights." Before the repossession, SECC had authorized Stevens Beechcraft to use the airplane for charter flights. The district court found that once WCC repossessed the airplane, it advised Stevens Beechcraft not to fly the aircraft except for demonstration purposes. While WCC was in constructive possession of the airplane, however, damage occurred to the nose cone bearing in the left engine. The district court could not determine whether the damage occurred during a sale demonstration flight or on a chartered flight. Without finding WCC negligent in any way, the district court, nonetheless, imposed the total cost of repair on WCC.
 
 
 16
 The district court found that the sale of the airplane was reasonable because it was sold by an authorized airplane dealer; information about the airplane was sent out to numerous buyers; and the airplane was shown to several buyers. SECC concedes that the court properly recognized that the sale of an airplane is not a routine matter, if for no other reason than its high value. SECC also concedes that "[i]t is clear that aircraft are expensive and special collateral, requiring special methods to achieve a sale consistent with the requirements of law." Nevertheless, SECC argues that "[i]t is clearly insufficient for a creditor to show that it turned the matter over to a dealer, and it is error for a court to rubber stamp such a superficial approach." "[T]he creditor's presale conduct was itself more than sufficient to negate a finding of a commercially reasonable disposition, even if the sale itself were proper." We disagree.
 
 
 17
 There is no record evidence to indicate that SECC was prejudiced in any way while the airplane was in the constructive repossession of WCC. While the nose cone bearing in the left engine was damaged after repossession by WCC, all necessary repairs were made by WCC. The value of the plane was not affected, and SECC was not required to pay for any repair to the airplane. Indeed, the district court found that the sale price of $265,000 was commercially reasonable. The airplane was repossessed in July 1979 and sold in October of the same year. In our view, no aspect of the creditor's presale conduct indicates commercial unreasonableness. Thus, the district court finding that the airplane was sold in a commercially reasonable manner is not clearly erroneous.
 
 C. D-9 DOZER
 
 18
 As to the third item, the D9 bulldozer, SECC argues that "no effort was made to sell this particular piece of equipment, other than to expose it for sale." "No advertising was done at all." From SECC's standpoint, it is self-evident that the mere placing of an item of collateral on a lot will not constitute a commercially reasonable sale.
 
 
 19
 On the other hand, WCC points out that its representative testified at trial that the repossessed equipment was advertised via a mailing circulated to thousands of possible purchasers of such heavy equipment. The district court found this testimony to be credible. Additionally, WCC points out that "undisputed testimony by WCC's expert that the equipment lot at London, Kentucky was operated in a manner similar to the sales operations of retailers of used mining equipment," KRS 355.9-507(2), indicates that sale in conformity with reasonable commercial practices among dealers establishes commercial reasonableness as a matter of law. Thus, the district court's finding that the D-9 dozer was sold in a commercially reasonable manner is not clearly erroneous.
 
 
 20
 Therefore, the district court judgment, granting deficiency awards to WCC in the amounts of $210,186.73 on the first promissory note affecting the airplane and dozer, and $170,723.21 on the second promissory note affecting the dragline to WCC, is AFFIRMED.
 
 
 
 *
 The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation