FIRST NATIONAL BANK OF THOMASBORO, Plaintiff-Appellee, v. RUS-SELL L. LACHENMYER, Defendant-Appellant.

Fourth District   No. 4—83—0667

Opinion filed March 27, 1985.

Frank H. Byers, of Byers, Byers & Greenleaf, of Decatur, for appellant.

Francis J. Davis, of Maloney & Davis, of Urbana, for appellee.

JUSTICE TRAPP delivered the opinion of the court:

On May 4, 1982, plaintiff First National Bank of Thomasboro (bank) filed suit seeking judgment against defendant Lachenmyer based on a defaulted $40,000 promissory note in relation to which there was a security agreement on defendant's Beech K-35 airplane and a mortgage of vessel on his 58-foot boat. On May 7, 1982, defendant had the plane moved from Champaign to Decatur, from there to be removed to the State of Florida. On May 8, 1982, the bank secured possession of defendant's plane in Decatur as subject to the security agreement. The bank also set off funds from defendant's accounts Nos. 133—019 and 130—389, allegedly escrow accounts. On May 11, 1982, defendant was served with plaintiff's complaint. On August 6, 1982, defendant filed a two-count countercomplaint seeking relief for the bank's acts involving his plane and the setoff from the alleged escrow accounts. The defendant did not deny execution of the note.

A bench trial was had with hearings conducted on February 4, 1983, and May 31, 1983. At the February hearing, following evidence on the complaint, the testimony of Florida witnesses Charles Myer, Federal Aviation Agency (FAA)-certified flight-and-ground instructor, and Patrick Grasch, aircraft broker, was taken on the countercomplaint. Between the hearings, the bank had the plane taken from storage in Decatur, flown to Champaign, and examined; it had been damaged. On June 21, 1983, defendant moved for leave to amend the countercomplaint to add count III, seeking relief under the Uniform Commercial Code (Code) (Ill. Rev. Stat. 1981, ch. 26, par. 1—101 *et seq.*) for the bank's actions involving his airplane. On August 9, 1983,

the trial court filed its opinion. On August 22, 1983, the court entered judgment in favor of the plaintiff on the complaint for $38,917.98, plus costs; in favor of plaintiff on count I of the counterclaim; in favor of defendant on count II of the counterclaim as to account No. 133—019 for $412.30, but against defendant as to account No. 130—389; and in favor of plaintiff on count III of the counterclaim, finding the bank had not disposed of the collateral and concluding that count III failed for want of proof.

On appeal, defendant challenges the trial court's judgment in favor of the bank on its note and, insofar as adverse to him, on each count of his counterclaim. No cross-appeal has been filed. Issues are treated in the following order. First, the issues relating to count II of his counterclaim, seeking recovery for the bank's setoff of funds from account No. 130—389: (1) whether the account was an escrow account; and if so, (2) whether he is entitled to actual damages for wrongful dishonor of certain checks and related charges under section 4—402 of the Code (Ill. Rev. Stat. 1981, ch. 26, par. 4—402); (3) or to punitive damages under *Allabastro v. Cummins* (1980), 90 Ill. App. 3d 394, 413 N.E.2d 86. Second, the issues relating to count I of defendant's counterclaim, seeking recovery under a theory of conversion for the bank's acts in relation to his plane: (4) whether the bank committed an act of conversion in taking the plane, or in subsequent acts in relation thereto; and (5) whether he is entitled to recover the market value of the plane at the time and place of conversion, legal interest and punitive damages under *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353. Third, issues relating to count III of the counterclaim seeking recovery under the Code for the bank's acts involving his plane: (6) whether the bank's conduct amounted to a "sale or other disposition," not "commercially reasonable" in "every aspect of the disposition" under section 9—504(3) of the Code (Ill. Rev. Stat. 1981, ch. 26, par. 9—504(3); (7) whether the bank's failure to give him notice prior to this "other disposition" bars recovery on its note under section 9—504 of the Code; and (8) whether the plane was "consumer goods" under section 9—109(1) of the Code (Ill. Rev. Stat. 1981, ch. 26, par. 9—109(1)) so that upon disposal in violation of article 9, he is entitled to recover damages under section 9—507(1) of the Code (Ill. Rev. Stat. 1981, ch. 26, par. 9—507(1)).

We begin with issues raised by the defendant on count II of the counterclaim. The first is whether account No. 130—389 was an escrow account, so that the bank as escrowee was prohibited by its fiduciary duty from setting off moneys in the account to its benefit. The trial court found the account was a personal checking account

and a proper source of setoff. We agree. Generally, questions involving the proper operation of escrow may be resolved by resort to consideration of the escrow agreement in conjunction with the underlying contract. (*Estate of Reinhold v. Mansfield* (1980), 90 Ill. App. 3d 224, 412 N.E.2d 1146.) Where the agreement is ambiguous because of a material omission, it is the duty of the trial court to construe the escrow, which construction will be upheld unless against the manifest weight of the evidence. (*McBride v. Commercial Bank* (1981), 101 Ill. App. 3d 760, 428 N.E.2d 739.) Here, it appears there was no written agreement between the bank and defendant. According to the evidence, the bank's escrow accounts are unnumbered. The bank disburses moneys paid toward escrow arrangements by cashier's checks immediately after recording payment by the purchaser upon escrow documents, routing them according to the direction of the individual payee on the escrow arrangement, *e.g.*, into a savings or checking account. In this case the cashier's checks were channeled by defendant's direction into account No. 130—389, identified by its number as a demand deposit or personal checking account, and on which defendant wrote checks. No error.

We next consider issues raised by the defendant on count I of the counterclaim, the first being whether the bank committed an act of conversion in taking the plane, or in its subsequent acts. In order to make a case for conversion, the plaintiff must establish each of four elements: (1) unauthorized and wrongful assumption of control, dominion, or ownership over the personal property of another; (2) plaintiff's right to the property; (3) his absolute and unconditional right to immediate possession thereof; and (4) a demand for possession. (*Kunde v. Biddle* (1976), 41 Ill. App. 3d 223, 353 N.E.2d 410.) The trial court found that the defendant was in default on the loan and had made the plane collateral under the security agreement, and that he had no absolute and unconditional right to immediate possession of the plane. We agree. Section 9—503 of the Code (Ill. Rev. Stat. 1981, ch. 26, par. 9—503) provides in pertinent part:

> "Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action."

*Jensen v. Chicago & Western Indiana R.R. Co.* (1981), 94 Ill. App. 3d 915, 419 N.E.2d 578, cited by defendant, is inapposite. Therein, the court stated that the fourth element of conversion, a demand for possession, was unnecessary when some other independent act of conver-

sion could be shown. The absence of a demand for possession cannot be equated to a defendant's failure to show his absolute and unconditional right to immediate possession of the collateral. No error.

■ We next consider the more nettlesome issues raised by defendant on count III of the counterclaim, which requires discussion of the evidence. Myer testified he last flew defendant's plane in October 1981, when it was in better than average condition, and opined that its May 1982 value was about $24,000. Myer said failure to maintain a plane in storage could reduce its market value, as could allowing its FAA certificate of airworthiness to lapse, and further testified that deterioration is more rapid in aircraft than in other transportation equipment. He thought there would be some damage to defendant's plane in view of the length of the storage.

Grasch opined that assuming the equipment and condition of defendant's plane was as Myer described, the value of defendant's plane was about $24,000 (retail) or $17,000 (wholesale, buying as a broker). Without having inspected the plane, he said that allowing its FAA certificate of airworthiness to lapse and leaving the plane unattended in storage would have a tremendous negative effect on its value. If a plane was not FAA-airworthy, he would not put a high value on it as he would not know its internal condition. He said that in May 1982, with the plane approaching the due date for annual inspection, he would have bid $14,000 wholesale. As of the February hearing, he would only buy the plane to sell it for parts and would bid $7,500.

During the interim between the hearings, the bank contracted with Midstate to perform an annual inspection on the plane prior to the May hearing. On April 20, 1983, Midstate's president, William Giannetti, and mechanic Ralph Cuchenbrod went to Decatur to get the plane. When they arrived, Decatur Aviation had moved the plane from storage to a maintenance and servicing area, and was servicing the plane for flight. Giannetti testified that the plane appeared generally as it had in May 1982 but was dirty from storage. He aired the cockpit for mildew and noticed corrosion on the brake discs. In checking the oil as to quantity, he noted it was black and needed to be changed at some time. During the flight to Champaign, the plane experienced an electrical power failure which prevented receiving radio messages.

Around May 12 or 13, 1983, Midstate's FAA-approved mechanic, Wayne VanEgmond, began the annual inspection. On draining the oil and pulling the oil screen from the engine, he discovered the screen was so full of metal shavings that the oil pump had collapsed it. He

tore down the engine to determine the cause and found one of the main bearings on the crankshaft had spun in the crankcase and "basically destroyed itself." The shavings were carried in the oil through the other bearings, oil pump, and engine, scraping additional metal and causing further damage. There was damage to the engine, crankcase, and crankshaft. VanEgmond obtained an estimate of $10,000 to overhaul the engine, with an additional $1,500 for repairs to the crankcase and crankshaft, if repairable. VanEgmond said the normal number of flight hours between major overhauls on an engine of this type was around 1,800, whereas this engine had about 900 flight hours on it. He had inspected the plane 45 flight hours earlier and the main bearing was not in a damaged condition. He did not believe the engine damage could have occurred entirely during the flight from Decatur to Champaign in April 1983, but was unable to approximate the number of flight hours required to cause the damage. He said the preflight inspection in Decatur was not detailed enough to discover any metal shavings then in the oil. VanEgmond discontinued his inspection after finding the damage to the engine. As of the May hearing, the engine remained disassembled in Midstate's maintenance department, while the aircraft frame was outside in a "tie-down spot."

Jim Barnes, overhauler of airplane engines, testified he had examined the engine from defendant's plane and opined that it was "either junk or needs to be overhauled badly." He estimated the overhaul cost at $10,750 minimum, assuming the crankshaft and crankcase could be repaired. He said the maker of the engine in defendant's plane was "famous for bearings spinning" and that bearings start to move in an engine with 300 hours on it. Barnes opined that the damage to this engine had taken more than one hour to occur.

Midstate's president Giannetti opined that the plane in its present condition could be sold for between $15,840 (retail) and $8,462 (wholesale), and concluded that $12,000 would be a good value for defendant's plane given its condition. He opined that if the engine were overhauled, the value of the plane would be increased to about $20,000.

Count III basically alleges that (1) as a result of the April 20, 1983, flight from Decatur to Champaign at the bank's direction and the lack of proper maintenance during the bank's possession, the plane was damaged; (2) the bank's acts in taking possession, failing to maintain the plane, flying it to Champaign in April 1983, and removing its engine constituted conversion to the bank's exclusive use and benefit; (3) the bank failed to give him notice of the sale or conversion of the collateral as required under section 9—504(3) of the Code; (4) as

a result of the failure to give proper notice, plaintiff is barred from a deficiency judgment; (5) the plane constitutes "consumer goods" under section 9—109(1) of the Code and the bank's failure to comply with the requirements of section 9—507(1) of the Code entitles him to recovery; and (6) his remedies are cumulative. Upon count III, defendant argues the bank's acts amounted to an "other disposition" within the meaning of section 9—504(3) of the Code, but was not "commercially reasonable" in "every aspect of the disposition" as required by that section.

Section 9—504 states in part:

"Secured Party's Right to Dispose of Collateral After Default; Effect of Disposition. (1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. *** The proceeds of disposition shall be applied in the order following to

(a) the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorneys' fees and legal expenses incurred by the secured party;

(b) the satisfaction of indebtedness secured by the security interest under which the disposition is made;     .
* * *

(2) If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency.
***

(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. *Sale or other disposition may be *** at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.* Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 26, par. 9—504.)

Defendant contends that the bank's acts have essentially destroyed his airplane and amount to an "other disposition."

The parties cite no Illinois authority on the meaning of "other disposition" in the context of article 9 of the Code. Our own research has disclosed several decisions of other States involving article 9 claims. In *Mechanics National Bank v. Gaucher* (1979), 7 Mass. App. 143, 386 N.E.2d 1052, construing section 9—306 of the Code ("sold *** or otherwise disposed of"), the court held that the collateral, a mobile home, had not been "disposed of" where it had remained on the mobile home dealer's lot, as disposition implies a permanent transfer of possession. In *Cordova v. Lee Galles Oldsmobile, Inc.* (N.M. App. 1983), 100 N.M. 204, 668 P.2d 320, construing the concept of disposition under section 9—504(1) of the Code, the plaintiff voluntarily returned a car to the dealer and did not redeem it, an employee of the dealer inadvertently allowed the police department to borrow the car, and the car sustained damages. The dealer absorbed the repair costs and the car was subsequently sold. The court pointed out that the plaintiff had no loss by the loan of the car. The reviewing court did not believe that the term "otherwise dispose of" contemplated the loan of collateral.

We also note with interest the decision in *Harris v. Bower* (1972), 266 Md. 579, 295 A.2d 870. In that case, the creditor reduced to judgment the note on a boating craft in October 1969, and "repossessed" the boat in March 1970, reporting to the governmental unit on boating that he repossessed it for nonpayment. A certificate of title was issued to him in April 1970. The boat was not sold for credit toward the judgment, which was in excess of $19,000, and the debtor's widow brought the action for an accounting, damages and other relief. There was testimony at hearing that in its condition in February 1970, the boat would have brought $13,900 in the open market. There was little evidence of any effort on the part of the secured party to sell the boat after obtaining title and possession, and the boat was allowed to depreciate ruinously. The widow argued that under section 9—505(2) of the Code, the secured party accepted and retained possession of the boat in satisfaction of the obligation. Although the court was unwilling to hold that the secured party's actions had extinguished the entire debt, the court found that the secured party had not acted in a commercially reasonable manner, citing (1) section 1—102(1) of the Code requiring that it be "liberally construed and applied to promote its underlying purposes and policies"; (2) section 1—203, imposing an obligation of good faith in the performance and enforcement of every contract or duty within the Code; (3) section 9—504(3), requiring that "every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable"; and (4) section 9—

507(2), setting forth the standard for sales and other types of disposition as basically in conformity with reasonable commercial practices among dealers in the type of property sold or otherwise disposed of.

The court in *Harris* stated that while most chattels depreciate at a fairly constant rate, it is well known that yachts, if not carefully and constantly maintained, depreciate at a ruinously progressive rate. That the secured party permitted this to happen seemed to the court not commercially reasonable and utterly lacking in common sense. In support of its approach, the *Harris* court noted a case involving a Super-Constellation aircraft as collateral, wherein the court concluded that the secured party did not sell the aircraft in a commercially reasonable manner and was not entitled to a deficiency judgment against the debtor in view of section 9—504 of the Code. The *Harris* court indicated that the shrinkage in the fair market value of the boat below its value when he took title and possession was attributable to his conduct and remanded for consideration of whether the plaintiff was entitled to credit for the fair market value of the boat.

Although the note here was not reduced to judgment when the bank took possession of defendant's plane, as in *Harris*, that case is otherwise similar in that the secured party, having seen fit to take possession of the collateral, has allegedly not treated it in a commercially reasonable manner.

In considering the defendant's argument, article 9 of the Code generally establishes a framework allocating rights and remedies between the parties to a security agreement aimed at effecting an approach of balance based upon the standard of commercial reasonableness. With regard to the evidence presented below, sections 9—501, 9—505(2), 9—507(1), and 9—207 are illustrative. Section 9—501 (Ill. Rev. Stat. 1981, ch. 26, par. 9—501) provides in part:

"(1) When a debtor is in default under a security agreement, a secured party has the rights and remedies provided in this Part and except as limited by subsection (3) those provided in the security agreement. He may reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure. *** A secured party in possession has the rights, remedies and duties provided in Section 9—207. The rights and remedies referred to in this subsection are cumulative.

(2) After default, the debtor has the rights and remedies provided in this Part, those provided in the security agreement and those provided in Section 9—207.

(3) To the extent that they give rights to the debtor and im-

pose duties on the secured party, the rules stated in the subsections referred to below may not be waived or varied except as provided with respect to compulsory disposition of collateral (subsection (3) of Section 9—504 and Section 9—505) \*\*\*:

\* \* \*

(b) subsection (3) of Section 9—504 and subsection (1) of Section 9—505 which deal with disposition of collateral;

(c) subsection (2) of Section 9—505 which deals with acceptance of collateral as discharge of obligation;

\* \* \*

(e) subsection (1) of Section 9—507 which deals with the secured party's liability for failure to comply with this Part."

Section 9—505(2) (Ill. Rev. Stat. 1981, ch. 26, par. 9—505(2)) states in relevant part:

"In any other case involving consumer goods or any other collateral a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor \*\*\*. \*\*\* If the secured party receives objection in writing from a person entitled to receive notification within twenty-one days after the notice was sent, the secured party must dispose of the collateral under Section 9-504. In the absence of such written objection the secured party may retain the collateral in satisfaction of the debtor's obligation."

Section 9—507(1) (Ill. Rev. Stat. 1981, ch. 26, par. 9—507(1)) provides:

"If it is established that the secured party is not proceeding in accordance with the provisions of this Part disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor \*\*\* has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this Part. If the collateral is consumer goods, the debtor has a right to recover in any event an amount not less than the credit service charge plus 10% of the principal amount of the debt or the time price differential plus 10% of the cash price."

Section 9—207 (Ill. Rev. Stat. 1981, ch. 26, par. 9—207) sets forth the rights and duties of the parties when the collateral is in the secured party's possession:

"(1) *A secured party must use reasonable care in the custody and preservation of collateral in his possession.* \*\*\*

(2) Unless otherwise agreed, when collateral is in the secured party's possession

(a) reasonable expenses \*\*\* incurred in the custody, preservation, use or operation of the collateral are chargeable to the debtor and are secured by the collateral;
\* \* \*

(c) the secured party may hold as additional security any increase or profits (except money) received from the collateral, but money so received, unless remitted to the debtor, shall be applied in reduction of the secured obligation;
\* \* \*

(3) A secured party is liable for *any loss* caused by his failure to meet any obligation imposed by the preceding subsections but does not lose his security interest.

(4) A secured party may use or operate the collateral for the purpose of preserving the collateral or its value or pursuant to the order of a court of appropriate jurisdiction or, except in the case of consumer goods, in the manner and to the extent provided in the security agreement." (Emphasis added.)

The word "preservation," as used in section 9—207(1), has been held to include preservation of value. See *Farmers State Bank v. Ballew* (Okla. App. 1981), 626 P.2d 337, 340-41.

From the evidence here, several conclusions under article 9 appear. First, the bank's taking possession of the plane as collateral was in the context of section 9—503 of the Code, and the bank proceeded to reduce its claim on the note to judgment within the context of section 9—501(1). Both actions were permissible, as remedies of the secured party are cumulative under section 9—501(1). Second, the bank did not propose to retain the collateral in satisfaction of the obligation within the context of section 9—505(2) of the Code. Third, the bank did not sell or lease the collateral within the context of section 9—504. Fourth, as the trial court found, no maintenance was performed on the plane during the storage period after the bank's possession. Fifth, any preexisting damage to the engine of defendant's plane was at least exacerbated by the flight from Decatur to Champaign while in the bank's possession and on its order. Indeed, there was evidence that damage caused by metal shavings in the oil would result not only from flight time, but also by all other time the engine was running. Here, there was no evidence, for example, as to the amount of time the plane's engine was running in preparation for the flight from Decatur to Champaign, the flight time, the time the engine was running after the plane landed in Champaign. There was no evidence as to whether the plane's engine was started and run for any purpose from the time of landing until the oil was drained by VanEgmond in

May 1983. Moreover, there was evidence that the plane was moved from where it was left on the Decatur airport apron to storage at the bank's direction, but no evidence of the time the engine was running for this purpose. These considerations detract from the trial court's reference to Barnes' testimony as supplying the inference that the condition necessitating overhaul of the engine of defendant's plane preexisted its storage, and suggest a claim cognizable under section 9—207 of the Code, to be judged by the standard of reasonable care in the custody and preservation of collateral of this type.

In view of the language of count III of the counterclaim and its allegations, we decline to decide whether the bank's conduct amounted to an "other disposition" within the meaning of section 9—504, as we conclude that count III states a claim cognizable under section 9—207 of the Code. Dependent upon the proof, if meritorious, violation of section 9—207 by the secured party in possession would entitle defendant to a setoff against the debt.

■ In assessing the reasonableness of a secured party's treatment of collateral in its possession, we note several decisions of sister jurisdictions considering the statutory equivalents of section 9—207. In *Michigan National Bank v. Marston* (1970), 29 Mich. App. 99, 105-08, 185 N.W.2d 47, 50-51, commenting on the cumulative rights and remedies of a secured party under article 9, the court referred to *Olsen v. Valley National Bank* (1968), 91 Ill. App. 2d 365, 371, 234 N.E.2d 547, 550, as stating the majority rule, including Illinois, being founded on the rationale that a creditor is able to pursue any one of a number of remedies against a debtor until the debt is satisfied. The *Marston* court stated that this did not mean, however, that the secured party owed no duties to a debtor with respect to collateral:

"It would be unfair to allow a creditor to deprive the debtor of the possession and use of the collateral for an unreasonable length of time and not apply the asset or the proceeds from its sale toward liquidation of the debt. Moreover, it would be equally unfair to allow a creditor to take possession at all, if the creditor never intended to dispose of the security. For during the period that the debtor is deprived of possession he may have been able to make profitable use of the asset or may have gone to far greater lengths than the creditor to sell. Once a creditor has possession he must act in a commercially reasonable manner toward sale, lease, proposed retention where permissible, or other disposition. [Citations.] If such disposition is not feasible, the asset must be returned, still subject, of course, to the creditor's security interest. To the extent the creditor's

inaction results in injury to the debtor, the debtor has a right of recovery. [Citation.]" (29 Mich. App. 99, 108, 185 N.W.2d 47, 51.)

In *Ballew*, a bank sued to recover on notes and foreclose on security agreements on collateral securing them. A few days later, the creditor bank used self-help to repossess the collateral, used cars, part of the inventory of the debtor's business. The bank held the collateral for the 17 months, through the entry of summary judgment. The reviewing court remanded to determine whether the bank's actions as to the collateral had been reasonable, adopting the above language of *Marston* and stating:

"The secured party is not required to elect one remedy to the exclusion of all others. He may pursue one, then another. It is even possible that he could pursue more than one at the same time, if all his actions could be considered reasonable and not violative of Part 5 and Article 9 or other applicable law. *But if his actions result in impairment of the collateral, he will be liable to the debtor for the damages incurred. Once he has possession of the collateral his actions with regard to it must be reasonable in all respects.* \* \* \*

We find further support for our decision in other jurisdictions. In *Moran v. Holman*, 514 P.2d 817, 819-20 (Alaska 1973), the secured party used self-help to repossess collateral and used it for four months. He then brought suit against the debtor on the full amount of the debt. The suit was not tried for 25 months during which the secured party retained the collateral without offering to return it or to dispose of it. The court held that under proper circumstances a secured party may retain possession of collateral and still sue on the obligation. When, however, he retains collateral which depreciates in value, the debtor may validly claim his obligation as satisfied, even without written notice, under section 9—505(2). In *Schultz v. Delaware Trust Co.*, 360 A.2d 576, 578 (Del. Super. Ct. 1976), the court found that whether retention of collateral for a period of five years without disposition or return to the debtor is reasonable was a question of fact precluding summary judgment on that issue. In *Mack Financial Corp. v. Scott*, 100 Idaho 889, 606 P.2d 993, 997 (1980), the Idaho Supreme Court affirmed the decision of the trial court, which held that an unexplained delay of two years between repossession of the collateral and its sale at public auction constituted an unreasonable disposition of the collateral in violation of section 9—504(3). In

*Haufler v. Ardinger*, 28 U.C.C. Rep. Ser. 893, 896 (Mass. App. 979), the court found that a secured party, who took possession of collateral upon the debtor's default, used it in his own business for 38 months, then sold it, had unequivocally elected to retain the collateral in satisfaction of the debt." (Emphasis added.) (626 P.2d 337, 340-41.)

In *Henderson Few & Co. v. Rollins Communications, Inc.* (1978), 148 Ga. App. 139, 141-42, 250 S.E.2d 830, 832, the court stated:

"In the present case, [the seller, secured party] did not act in a commercially reasonable manner when it repossessed the collateral more than one year after suit was filed, never disposed of it or returned it to the [debtor], and apparently did not intend to apply the value of the asset toward liquidation of the alleged debt although a creditor can only recover the amount of the debt."

See generally Murray, Secured Transactions-Defenses of Impairment and Improper Care of Collateral, 79 Com. L.J. 265 (1974).

Section 9—207 does not impose liability on the bank for damages to or deterioration of the collateral which occurs prior to its possession. The damage to the engine of defendant's plane may be attributable solely to the period of the bank's possession, or may be allocable between that occurring while in the debtor's possession and that occurring after the bank took possession. Further evidence is required to determine if damages are to be allocated between the parties; an estimated cost of repairing preexisting damages and those which followed the bank's taking possession may provide a formula for allocating these damages.

However, once a secured party has possession of the collateral, its actions with regard to collateral must be reasonable in all respects *through the date of disposition*. Here, the evidence was that the annual inspection of defendant's plane by VanEgmond was never completed. Further, as of May 1983 the engine remained disassembled in Midstate's maintenance area and the aircraft shell was outside. The secured party may, therefore, be liable for any additional damages to the collateral violative of section 9—207's standard of reasonable care in the custody and preservation of collateral.

Myriad complications are introduced to a case when a secured party taking possession does not have the collateral examined and evaluated as of that date. We are unable to determine and give meaning from the record on appeal to the standard of reasonable care in the custody and preservation of collateral of the type involved, and the nature and duties this standard entails in the examination and

evaluation of such collateral when the secured party takes possession. We find, however, that count III of the counterclaim sufficiently alleges the bank's violation of the Code so as to raise a question of fact on the damage to the collateral attributable to its period of possession, and entitling him to a setoff in the amount of the loss caused by the bank's failure to meet Code obligations. We therefore reverse the judgment as to count III of the counterclaim and remand for further proceedings consistent with this opinion.

■ Defendant next argues that the bank's failure to give him notice of the "other disposition" of his plane bars recovery on the note under section 9—504, citing *Stensel v. Stensel* (1978), 63 Ill. App. 3d 639, 380 N.E.2d 526, which held that failure to give a debtor notice of sale as required by the Code barred the secured party's recovery of any deficiency judgment. There is as yet no deficiency judgment. Further, the "absolute bar" view expressed in *Stensel* has been rejected by the Illinois Supreme Court. *First Galesburg National Bank & Trust Co. v. Joannides* (1984), 103 Ill. 2d 294, 469 N.E.2d 180.

Finally, defendant claims his plane is "consumer goods" under section 9—109(1) of the Code, so that on disposal in violation of article 9 he is entitled to recover damages under section 9—507(1). The trial court made no finding on this issue, and the question is better addressed on remand.

Judgment on the complaint affirmed subject to any setoff due defendant on the countercomplaint; judgment affirmed as to counts I and II of the countercomplaint; judgment reversed as to count III of the countercomplaint and remanded for proceedings consistent with this opinion.

Affirmed in part, reversed in part, and cause remanded.

WEBBER and MILLS, JJ., concur.