FIRST NATIONAL BANK OF THOMASBORO, Plaintiff-Counterdefendant-Appellee and Cross-Appellant, v. RUSSELL L. LACHENMYER, Defendant-Counterclaimant-Appellant and Cross-Appellee.

Fourth District   No. 4—85—0889

Opinion filed September 3, 1986.

Frank H. Byers, of Byers, Byers & Greenleaf, Ltd., of Decatur, for appellant.

Francis J. Davis, of Maloney & Davis, of Urbana, for appellee.

JUSTICE WEBBER delivered the opinion of the court:

This case was before us once before in *First National Bank v. Lachenmyer* (1985), 131 Ill. App. 3d 914, 476 N.E.2d 755. The factual background was sufficiently set forth in that opinion and needs no further expansion here. We affirmed the trial court in its judgment for the plaintiff on the note which was the subject of the complaint; we likewise affirmed in favor of the plaintiff-counterdefendant (bank) on count I of the counterclaim, which alleged conversion of the airplane, and in favor of the bank on count II of the counterclaim, alleging conversion of an escrow account. We reversed the trial court's judgment in favor of the bank on count III of the counterclaim, alleging violation of the provisions of the Uniform Commercial Code—secured transactions (Code) (Ill. Rev. Stat. 1981, ch. 26, par. 9—101 *et seq.*) and remanded for a new trial on that count.

Prior to retrial defendant-counterplaintiff (Lachenmyer) filed an amended count III to his counterclaim. It contained three essential allegations: (1) violation of the duty of reasonable care of collateral specified in section 9—207(1) of the Code (Ill. Rev. Stat. 1981, ch. 26, par. 9—207(1)); (2) that the plane was a "consumer good" within the meaning of section 9—507(1) of the Code (Ill. Rev. Stat. 1981, ch. 26, par. 9—507(1)) entitling him to the penalties contained in that section; and (3) that the bank's actions with regard to the plane constituted an "other disposition" within the meaning of section 9—504(1) of the Code (Ill. Rev. Stat. 1981, ch. 26, par. 9—504(1)) thereby discharging the underlying indebtedness.

The trial court found in favor of Lachenmyer on the violation of section 9—207(1) and assessed damages in the amount of $16,125; the court found in favor of the bank on the other two allegations. Lachenmyer has appealed, and the bank has cross-appealed.

The positions of the parties on appeal should be briefly set forth in order to have a better understanding of our disposition. In arriving at its damage figure of $16,125, the trial court took a rough average of the testimony of the value of the plane on the date on which the bank took possession of it, May 7, 1982, that is, $22,625; and subtracted from that figure the estimate of the salvage value on the date of hearing, September 1985, that is, $6,500.

Lachenmyer claims that the court should have held the plane to

be a "consumer good" within the meaning of section 9—109(1) of the Code and calculated damages under section 9—507(1). He calculates such damages as of October 1, 1985, at $24,869. He further maintains that the court should have held the bank's actions with regard to the plane as an "other disposition" under section 9—504(1) of the Code, thus eliminating the underlying indebtedness. Alternatively, he claims that the damages should be the estimated value of the plane on May 7, 1982, or $22,625.

The bank's position is that the trial court was correct in finding that the plane was not a "consumer good" and that it did not make an "other disposition." It then calculates Lachenmyer's damages under section 9—207(1) as follows: $22,625 (estimated value on May 7, 1982) minus $10,900 cost of overhaul of the engine (explained below) minus $6,750 salvage value, for a net figure to him of $4,975.

We are of the opinion that damages were properly calculated under section 9—207(1), although we reach a different result from that of the trial court. We are also of the opinion that the plane was not a "consumer good" and that the bank did not make an "other disposition."

■ We turn first to the latter issues, first, that of "consumer good." Lachenmyer executed the note which was the subject of the complaint in favor of the bank for $40,000 on June 20, 1980. The note included a box at the top labeled "Business or Agricultural." This box was marked with an "X." The note also contained the following provision: "Borrower hereby warrants and represents that the proceeds of this note will be used for the following purposes:" The words "Business capital" were typed onto the form of the note following that provision. A security agreement was executed with the note pledging the plane.

Lachenmyer testified at the retrial that he acquired the plane in 1974 as a hobby. Sometime later he made an agreement with Mid-State Aviation of Champaign. Under the agreement Mid-State could use the plane for commercial purposes. In return it stored, maintained, and insured the plane. Lachenmyer could fly whenever he wanted to and Mid-State would provide the pilot. He stated that he never received any money for allowing Mid-State to use the plane, never took any depreciation on his tax returns for it, and paid for the fuel used on flights taken by him.

The Code divides goods into four classes: consumer goods, equipment, farm products, and inventory. (Ill. Rev. Stat. 1981, ch. 26, par. 9—109.) Uniform Commercial Code, comment 2, to that section states:

"The classes of goods are mutually exclusive; the same property cannot at the same time and as to the same person be both equipment and inventory, for example. In borderline cases—a physician's car or a farmer's jeep which might be either consumer goods or equipment—the principal use to which the property is put should be considered as determinative. Goods can fall into different classes at different times; a radio is inventory in the hands of a dealer and consumer goods in the hands of a householder." (Ill. Ann. Stat., ch. 26, par. 9—109, Uniform Commercial Code Comment, at 82 (Smith-Hurd 1974).)

Consumer goods are defined as goods "used or bought for use primarily for personal, family or household purposes." Ill. Rev. Stat. 1981, ch. 26, par. 9—109(1).

As has been indicated, Lachenmyer seeks to have the plane declared a "consumer good" in order to recover the damages provided in section 9—507(1) of the Code (Ill. Rev. Stat. 1981, ch. 26, par. 9—507(1)), which provides in pertinent part:

"If the collateral is consumer goods, the debtor has a right to recover in any event an amount not less than the credit service charge plus 10% of the principal amount of the debt or the time price differential plus 10% of the cash price."

Professors White and Summers in commenting on section 9—507 state the following:

"If the secured party resells the collateral in a commercially unreasonable manner, then the logical benchmark by which to measure the debtor's loss is the difference between the amount actually realized on resale and the amount which would have been obtained had there been compliance with the Code's requirements. However, it is now all but indisputable that compensatory damages are an insufficient deterrent to creditor misbehavior in nickel and dime consumer transactions where such damages will amount to very little in most cases. It is not surprising, therefore, that the draftsmen installed a statutory penalty in 9—507 to up the ante for those who would abuse the consumer." J. White & R. Summers, Uniform Commercial Code sec. 26—14, at 1126 (2d ed. 1980).

It is difficult to comprehend that an airplane could be a "nickel and dime" transaction, although it might be so stretched in the case of an automobile or motor home used only for family purposes. It might even be arguable that when Lachenmyer purchased the plane in 1974 it could be so considered, but when in 1980 it was pledged for business purposes and was so used thereafter by Mid-State under a

business agreement with Lachenmyer, its character of necessity changed. We also note that the plane's "1979 Aircraft Certificate of Registration" listed the plane's primary usage as business. We do not agree with his argument that once a chattel has assumed the nature of a consumer good, it so remains for all time.

Lachenmyer cites *Commercial Credit Equipment Corp. v. Carter* (1973), 83 Wash. 2d 136, 516 P.2d 767. In that case the debtor purchased an airplane and executed simultaneously a security agreement in it. He used it for personal purposes for about three months and then for business purposes thereafter. The Washington court found that the intent of the debtor at the time of the execution of the security agreement determined the character of the chattel. The distinction from the instant case is that the security interest attached at a time when the intent of Lachenmyer, as gleaned from the statements in the note and security agreement, was to use the plane for business purposes. His subjective notions cannot override the objective evidence. We cannot think that the Code should allow a windfall to a debtor for failing in a business venture.

The trial court was correct in holding that the plane was not a "consumer good."

■ We turn next to Lachenmyer's contention that the bank made an "other disposition" of the plane under section 9—504(1) of the Code and thus is barred from any deficiency under section 9—504(3) (Ill. Rev. Stat. 1981, ch. 26, pars. 9—504(1), (3)). Those sections provide in pertinent part:

"(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. ***

  * * *

(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a state-

ment renouncing or modifying his right to notification of sale."

Lachenmyer derives no benefit from section 9—504 unless he can maintain that the bank is not entitled to any deficiency. The "absolute bar" concept was rejected by the supreme court in *First Galesburg National Bank & Trust Co. v. Joannides* (1984), 103 Ill. 2d 294, 469 N.E.2d 180. Thus, damages must be assessed under section 9—207 (Ill. Rev. Stat. 1981, ch. 26, par. 9—207).

In any event, the plane was subject to litigation, including a count for conversion, until our original opinion was filed in 1985. Pending that decision, the bank's liability was properly grounded under section 9—207 for failure to preserve the collateral because it could not be sold, leased, or disposed of in any manner. In our decision it was stated that the evidence showed "the bank did not propose to retain the collateral in satisfaction of the obligation within the context of section 9—505(2) of the Code [and] the bank did not sell or lease the collateral within the context of 9—504." *First National Bank v. Lachenmyer* (1985), 131 Ill. App. 3d 914, 924, 476 N.E.2d 755, 763.

So far as the record in the instant case is concerned, it does not appear that the plane has yet been sold or disposed of, although in oral argument it was represented that it had been sold in October 1985 for $6,750.

We do not believe that failure to preserve the collateral is an "other disposition" within the meaning of section 9—504(1), and the trial court was correct in so holding.

■■ The last, and principal, issue in the case is the assessment of damages. We agree with the trial court that a value of $22,625 may be assumed for the plane on May 7, 1982, and that a salvage value of $6,500 may also be assumed in October 1985. We depart from the trial court's findings in that it did not consider the damages to the engine, which were estimated by the evidence to average $10,900. We also take into consideration the admission by the bank that it is responsible for the damage to the fuselage of the plane. In arriving at our decision, we must briefly review the evidence concerning the engine.

Testimony from the first trial indicated that the plane was stored in Decatur in a heated hangar from May 7, 1982, until April 20, 1983, when it was flown back to Champaign. There was evidence that the flight lasted about 15 minutes and that the engine was run about 30 minutes. Prior to that flight, there had been logged 942 hours on the engine.

In Champaign it was discovered that one of the main bearings had self-destructed and had filled the oil, and hence the engine parts, with

metal shavings. Expert testimony indicated that in this condition the engine would require a total overhaul. One estimate for this work was $11,050 and another was $10,750. The average of these figures is $10,900, which we will accept as a rational basis for this damage. It is the contention of the bank that while it admits responsibility for the other damage to the plane, it is not responsible for the engine damage and hence the damage award to Lachenmyer should be adjusted accordingly. We agree.

The critical question is whether the damage to the engine occurred on the flight from Decatur to Champaign, or whether it was preexisting. The resolution depends on the testimony of three witnesses: Jim Barnes, Wayne Van Egmond, and Ken Paul. Barnes and Van Egmond testified at both trials; Paul only at the second; the trial court took judicial notice of the evidence taken at the first trial.

Both Barnes and Van Egmond possessed Federal Aviation Authority (FAA) certifications to conduct inspections of aircraft and, based upon our examination of the record, we cannot question their status as experts. Paul possessed a bachelor of science degree in chemical and metallurgical engineering and was in the business of buying and selling aircraft.

Barnes and Van Egmond testified at both trials that it was their opinion that the damage to the engine could not have occurred in the short flight from Decatur to Champaign. However, Van Egmond was impeached at the second trial by his testimony at the first that he found no metal shavings in the oil or any irregularity with respect to the engine in any inspection prior to May 1982. Barnes' testimony was not impeached but was contradicted by that of Paul, who stated at the second trial that the oil-analysis figures which he had examined showed the metal content to be within acceptable limits. He also contradicted both Barnes and Van Egmond by saying that the damage could have occurred on the flight from Decatur to Champaign.

We are well aware of the deference which must be given to a trial court's finding at a bench trial. However, in this case the trial court simply found "that the airplane was in good condition when the bank took possession." It assigned no reasons for so finding. In *People ex rel. Brown v. Baker* (1981), 88 Ill. 2d 81, 430 N.E.2d 1126, the supreme court held that the testimony of a witness cannot be disregarded where it is unimpeached, not contradicted by positive testimony or by circumstances, or found to be inherently improbable.

In the instant case it is our opinion that the testimony of Paul cannot be said to contradict that of Barnes and Van Egmond. As we have noted, both of the latter were FAA certified mechanics; Paul

was not. Paul's testimony related almost entirely to the value of the plane, the deterioration of the engine being only one of the several factors upon which he based his valuation testimony. Nor do we believe that Van Egmond's testimony at the second trial was seriously impeached. At both trials he stated that the extent of the damage could not have occurred during a 15-minute flight with the engine operating only 30 minutes in connection therewith. At the first trial he stated that he did not observe metal shavings in the oil at prior inspections. This leads only to the logical fallacy of *post hoc ergo propter hoc* in saying that the Decatur-Champaign flight of necessity caused the damage. His testimony is not inherently improbable. What is inherently improbable is that the extent of damage could have been caused by a 30-minute operation of the engine when it had already logged 942 hours of operation.

In any event, Barnes' testimony was not impeached nor contradicted by equally expert evidence. It therefore follows that the trial court erred in disregarding it.

■ It remains to seek a solution to this seemingly endless litigation. We do so thusly: we accept the valuation of the plane on May 7, 1982, at $22,625; we accept the bank's argument that it did not cause the engine damage which is fixed at an average of $10,900; the difference between these figures is $11,725, which we fix as Lachenmyer's damages under section 9—207(1) of the Code. The record does not indicate that there has been a disposition of the plane, but the trial court's estimate of $6,500 salvage may be taken as within bounds of reason. The difference between this figure and the damage award or $11,725, or $5,225, represents the other damage to the plane for which the bank admits responsibility.

In summary, we affirm the trial court in its findings: (1) that the plane was not a "consumer good," (2) that the bank did not make an "other disposition" of the plane, and (3) that damages should be awarded under section 9—207(1) of the Code. However, pursuant to our authority under Supreme Court Rule 366(a)(5) (87 Ill. 2d R. 366(a)(5)) we modify the damage award to $11,725.

Affirmed as modified.

McCULLOUGH, P.J., and SPITZ, J., concur.